UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

ALLSTATE INSURANCE COMPANY,
ALLSTATE INDEMNITY COMPANY,
ALLSTATE PROPERTY & CASUALTY
INSURANCE COMPANY,
ALLSTATE FIRE & CASUALTY INSURANCE
COMPANY,
ALLSTATE VEHICLE & PROPERTY
INSURANCE COMPANY,
ALLSTATE NEW JERSEY INSURANCE
COMPANY, AND
ALLSTATE NEW JERSEY PROPERTY &
CASUALTY INSURANCE COMPANY,

                Plaintiffs,

vs.

GENERAL MEDICAL, P.C. (d/b/a  Cornelia Pain
Management & Rehab and All Family Pain
Management),
SUPERIOR MEDICAL REHAB, P.C.,
NIRMALA BHATTACHARYA, as Personal
Representative of the Estate of SUJIT
BHATTACHARYA, M.D., deceased,
SIMA ANAND, M.D.,
AMSAC, INC.,
ADNAN MUNAWAR,
SHERYAR A. CHAUDHRY, AND
LEONARD A. CHUMSKY,

                Defendants.

Civil Action 1:14-cv-1342

## PLAINTIFFS' COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property &

Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Vehicle &

Property Insurance Company, Allstate New Jersey Insurance Company, and Allstate New Jersey

Property & Casualty Insurance Company (collectively, "Allstate" and/or "plaintiffs"), by their attorneys, Smith & Brink, P.C., hereby allege as follows:

## I.    INTRODUCTION

1.      This case is about the unlawful operation and control of two medical professional corporations.

2.      Amsac, Inc. ("Amsac") and its owners/operators, Adnan Munawar ("Munawar"), Sheryar A. Chaudhry ("Chaudhry"), and Leonard A. Chumsky ("Chumsky") (collectively, "Management Defendants"), conspired with licensed physicians, Sujit Bhattacharya, M.D., deceased, ("Bhattacharya") and Sima Anand, M.D. ("Anand"), to incorporate, operate, and control General Medical, P.C. ("General Medical") and Superior Medical Rehab, P.C. ("Superior Medical") (collectively "PC Defendants") in direct violation of New York law.

3.      As a direct result of the conduct described below, the defendants induced Allstate to pay the PC Defendants for health care services that were not actually compensable under New York law.

4.      Specifically, the defendants schemed to defraud Allstate by misrepresenting the true ownership and control of the PC Defendants, along with their eligibility to pursue No-Fault Insurance benefits under New York Law.

5.      While the PC Defendants appeared—albeit facially—to be lawfully owned, operated, and controlled by their apparent physician-owner, each entity was actually controlled by the Management Defendants, none of whom were licensed to (a) practice medicine or (b) possess an ownership or controlling interest in a professional corporation organized and registered to provide physician services.

6.      Despite corporate records listing Bhattacharya and Anand as the sole officer, director, and shareholder of General Medical and Superior Medical, respectively, these entities

were actually under the control of Amsac, a "management" company owned/operated by non-licensed laypersons Munawar, Chaudhry, and Chumsky.

7.     The defendants also defrauded Allstate by creating and submitting treatment records and demands for payment relative to health care services that were (a) unnecessary, (b) fraudulently reported, and/or (c) not actually rendered as represented.

8.     The success of the defendants' scheme to defraud relied on the transmission, through the U.S. Mail, of treatment records, invoices, bills, and other insurance claim documents warranting the PC Defendants' eligibility to collect No-Fault benefits under New York law.

9.     Allstate reasonably relied on these documents—and the representations contained therein—in paying No-Fault claims submitted by (or on behalf of) the PC Defendants.

10.     All of the conduct alleged herein was undertaken intentionally.

11.     By this action, Allstate seeks to recover more than $2,120,000.00 paid directly to the PC Defendants on the grounds that (a) these entities billed Allstate for fraudulent health care services, and (b) the Management Defendants' unlawful operation and control of the PC Defendants rendered each entity ineligible for reimbursement under New York's No-Fault laws.

12.     Allstate also seeks a declaration pursuant to 28 U.S.C. § 2201 that it is not legally obligated to pay reimbursement of more than $2,316,714.37 in currently-pending and/or previously denied No-Fault insurance claims that have been submitted to Allstate by, or on behalf of, the PC Defendants because the PC Defendants were, at all relevant times, unlawfully operated and controlled by non-licensed laypersons, and thus have always been legally ineligible for reimbursement under New York's No-Fault laws.

13.     In each claim at issue in this Complaint, an Allstate automobile insurance contract was the platform upon which the defendants sought—and in many cases obtained—payment for the health care services that were not compensable under New York's No-Fault laws.

## II.   PARTIES

### A.   PLAINTIFFS

14.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Vehicle & Property Insurance Company, Allstate New Jersey Insurance Company, and Allstate New Jersey Property & Casualty Insurance Company are corporations organized under the laws of the State of Illinois.

15.     Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company, have their principal places of business in Northbrook, Illinois, and Allstate New Jersey Insurance Company and Allstate New Jersey Property & Casualty Insurance Company have their principal places of business in Bridgewater, New Jersey.

16.     At all times relevant to the allegations contained in this Complaint, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, and Allstate Vehicle & Property Insurance Company were authorized to conduct business in New York, and at all times relevant to the allegations contained in this Complaint, persons insured under policies issued by Allstate New Jersey Insurance Company and Allstate New Jersey Property & Casualty Insurance Company travelled to the State of New York, and purportedly received treatment at one or more of the PC Defendants.

B.    DEFENDANTS

17.    Nirmala Bhattacharya, Personal Representative of the Estate of Sujit Bhattacharya, M.D., is an individual duly appointed by the Nassau County Surrogate's Court, State of New York, on July 31, 2013 pursuant to the duly issued letters of administration as the Personal Representative of the Estate of Sujit Bhattacharya, M.D., deceased.  All allegations herein referencing "Sujit Bhattacharya, M.D.," "Bhattacharya,", or "defendants" collectively, are directed to Nirmala Bhattacharya in her capacity as Personal Representative of the Estate of Sujit Bhattacharya, M.D. as a named defendant in this action.

18.    Sujit Bhattacharya, M.D., resided in and was a citizen of the State of New York.

19.    Upon information and belief, Bhattacharya died on December 11, 2012.

20.    At all relevant times, Bhattacharya was licensed by the State of New York to practice medicine.

21.    Sima Anand, M.D. resides in and is a citizen of the State of New York.

22.    At all relevant times, Anand was licensed by the State of New York to practice medicine.

23.    General Medical is a New York medical professional service corporation with a principal place of business located at 3857 Kings Highway, Brooklyn, NY.

24.    At all relevant times, Bhattacharya falsely purported to be the sole officer, director, and shareholder of General Medical.

25.    At all relevant times, General Medical conducted business under the assumed names of "Cornelia Pain Management & Rehab" and "All Family Pain Management."

26.    At all relevant times, and in direct violation of N.Y. Business Corporation Law § 1508, General Medical was unlawfully operated and controlled by one or more non-licensed

laypersons, and was therefore ineligible to collect payments pursuant to N.Y. Insurance Law § 5102.

27.     Superior Medical is a New York medical professional service corporation with a principal place of business located at 35-50 92nd Street, Jackson Heights, NY.

28.     At all relevant times, Anand falsely purported to be the sole officer, director, and shareholder of Superior Medical.

29.     At all relevant times, and in direct violation of N.Y. Business Corporation Law § 1508, Superior Medical was unlawfully operated and controlled by one or more non-licensed laypersons, and was therefore ineligible to collect payments pursuant to N.Y. Insurance Law § 5102.

30.     Amsac is a New York corporation with its principal place of business located at 591 Stewart Avenue, Suite 400, Garden City, NY.

31.     Munawar, Chaudhry, and Chumsky have an ownership interest in and/or exert control over Amsac.

32.     At all relevant times, Amsac was the PC Defendants' billing and management company.

33.     Under the control of Munawar, Chaudhry, and Chumsky, Amsac has been used to (a) unlawfully operate and control the PC Defendants, and (b) unlawfully share in the professional medical fees collected by the PC Defendants.

34.     Munawar resides in and is a citizen of the State of New York.

35.     Munawar has never been licensed to provide professional health care services.

36.     At all relevant times, Munawar was an owner of Amsac.

37.     At all relevant times, Munawar, through Amsac, exercised actual control over the operation and/or management of the PC Defendants in violation of New York law.

38.     Chaudhry resides in and is a citizen of the State of New York.

39.     Chaudhry has never been licensed to provide professional health care services.

40.     At all relevant times, Chaudhry was an owner of Amsac.

41.     At all relevant times, Chaudhry, through Amsac, exercised actual control over the operation and/or management of the PC Defendants in violation of New York law.

42.     Chumsky resides in and is a citizen of the State of New York.

43.     Chumsky has never been licensed to provide professional health care services.

44.     At all relevant times, Chumsky an owner and/or operator of Amsac.

45.     At all relevant times, Chumsky, through Amsac, exercised actual control over the operation and/or management of the PC Defendants in violation of New York law.

**III.    JURISDICTION AND VENUE**

46.     Jurisdiction over this action is conferred upon this Court by 28 U.S.C. § 1331, 18 U.S.C. § 1962(c)-(d), and 18 U.S.C. § 1964.

47.     Supplemental jurisdiction over plaintiffs' state law claims is proper under 28 U.S.C. § 1367.

48.     Venue is proper under 28 U.S.C. § 1391(b)(2) whereas the substantial majority of the wrongful acts known to Allstate as alleged herein with particularity were carried out within the Eastern District of New York.

7

IV. **FACTUAL ALLEGATIONS REGARDING THE DEFENDANTS' UNLAWFUL OPERATION AND CONTROL OF GENERAL MEDICAL AND SUPERIOR MEDICAL**

49.     As discussed below, the defendants, at all times relevant, knew that the PC Defendants were operating in violation of New York law, and were thus ineligible to pursue and collect No-Fault benefits because: (a) the PC Defendants were actually operated and controlled by one or more persons not licensed to practice medicine; (b) the PC Defendants engaged in unlawful fee-splitting with one or more non-licensed laypersons; and (c) the defendants intentionally and knowingly submitted health care documentation representing that the PC Defendants were owned and operated in accordance with New York law, when, in fact, they were not.

50.     The ownership and control of the PC Defendants by one or more non-licensed laypersons compromised patient care, as the provision of health care services by the PC Defendants was, at all relevant times, subject to the pecuniary interests of non-physicians (i.e., the Management Defendants), as opposed to the exercise of independent medical judgment by a true physician-owner.

51.     Because the PC Defendants were (a) fraudulently incorporated, (b) used as a conduit to unlawfully split professional fees with non-licensed laypersons, and (c) not solely operated or controlled by licensed physicians, they were each ineligible to pursue and collect reimbursement of No-Fault benefits under New York law.

A.     NEW YORK'S NO-FAULT LAWS AND LICENSING STATUTES

52.     Allstate underwrites automobile insurance in the State of New York.

53.     New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay reasonable fees for necessary healthcare services.

54.     Under New York's Comprehensive Motor Vehicle Reparations Act (N.Y. Ins. Law § 5101, *et seq.*), and the regulations promulgated pursuant thereto (11 NYCRR § 65, *et seq.*) (collectively, "the No-Fault laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault benefits") to Allstate claimants.

55.     A patient can assign No-Fault benefits to healthcare providers.

56.     Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company and receive payment for necessary medical services rendered, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3").

57.     Pursuant to § 403(d) of the New York State Insurance Law, NF-3s must be verified by the healthcare provider subject to the following warning: "Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime" (hereinafter referred to as the "NF-3 Verification").

58.     Pursuant to New York's No-Fault laws, fraudulently incorporated professional corporations are not eligible to receive No-Fault benefits.

59.     In New York, only a licensed medical doctor may: (a) practice medicine; (b) own and control a professional service corporation authorized to practice medicine; (c) employ and

supervise other physicians; and (d) derive—absent statutory exceptions not applicable here—economic benefit from physician services.

60.  New York's No-Fault laws provide that "[a] provider of healthcare services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York." *See* 11 NYCRR § 65-3.16(a)(12).

61.  New York Business Corporation Law § 1504 provides that no professional service corporation may render professional services except through individuals authorized by law to render such professional services as individuals.

62.  Section 1507 of the business corporation law prohibits a professional service corporation from issuing shares to individuals unless they are "engaged in the practice of such profession in such corporation." It also prohibits such shareholder(s) from entering into any agreement, granting proxies or transferring control to individuals who are not authorized by law to practice the profession for which the professional corporation is authorized to practice.

63.  Pursuant to Section 1508 of the Business Corporation Law of New York, no individual may be a director or officer of a professional service corporation unless he is authorized by law to practice in this state a profession which such corporation is authorized to practice.

64.  Under the Education Law of New York § 6530(19), it is professional misconduct for a licensed physician to permit any person to share in the fees for professional services, other than a partner, employee, or associate of a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee.

10

65.     In New York, insurers may seek affirmative recovery against individuals and entities that have violated the above statutes and regulations.

66.     In *State Farm Mutual Automobile Insurance Co. v. Mallela*, 827 N.E.2d 758 (N.Y. 2005), the Court of Appeals of New York upheld 11 NYCRR § 65-3.16(a)(12) on the grounds that medical corporations that are fraudulently incorporated under New York Business Corporation Law §§ 1507 and 1508, and New York Education Law § 6507(4)(c) are not entitled to reimbursement from insurance carriers for No-Fault insurance claims.

67.     In *Metroscan Imaging, P.C. v. GEICO Insurance Co.*, 823 N.Y.S.2d 818, 821-822 (N.Y. App. Div. 2006), the court held that an insurer may maintain a cause of action against a fraudulently incorporated medical provider to recover monies paid on or after April 5, 2002 (11 NYCRR 5-3.16(a)(12)'s effective date).

**B.      SPECIFIC EVIDENCE OF UNLAWFUL LAYPERSON OPERATION AND CONTROL OF GENERAL MEDICAL AND SUPERIOR MEDICAL**

68.     As explained below, Amsac and its layperson owners, Munawar, Chaudhry, and Chumsky, in concert with Bhattacharya and Anand, have perpetrated a scheme aimed at inducing Allstate to make No-Fault reimbursement payments to the PC Defendants, even though the PC Defendants—because of these defendants' unlawful conduct—were ineligible for No-Fault reimbursement under New York law.

**1.      Origins of Amsac**

69.     Amsac was created as a vehicle to allow Munawar, Chaudhry, and Chumsky to unlawfully share in the proceeds of No-Fault reimbursement payments obtained by the PC Defendants.

70.     Upon information and belief, following the conclusion of litigation concerning Munawar and his associates' unlawful control of certain professional health care providers (i.e.,

11

Universal Medical and All Family Medical), Munawar and his associates sought an alternate avenue through which to continue their unlawful pursuit of No-Fault reimbursement payments.

71.     To this end, Munawar and his associates restructured the former provider entities, and caused the creation of General Medical and Superior Medical for the express purpose of providing Munawar and associates with access to the professional proceeds generated by General Medical and Superior Medical.

72.     Specifically, Munawar and Chaudhry conspired to incorporate Amsac to ostensibly serve as a "management" company providing billing, collection, and other services to General Medical and Superior Medical.

73.     The creation of Amsac by Munawar and Chaudhry allowed these non-licensed laypersons to conceal their involvement in the operation and control of General Medical and Superior Medical, and also allowed for easy access to the professional fees generated by the operation of General Medical and Superior Medical.

74.     Notably, the "Amsac" name appears to be an acronym derived from Munawar and Chaudhry's initials, A.M. (i.e., **A**dnan **M**unawar) and S.A.C. (i.e., **S**heryar **A**. **C**haudhry), respectively.

### 2.     General Medical Replaces Universal Medical

75.     Approximately four months after the incorporation of Amsac, on or about August 13, 2008, General Medical was incorporated under the name "Kings General Medical, P.C."

76.     On or about October 9, 2008, the company's name was truncated to "General Medical, P.C."

77.     According to the New York State Education Department's Office of the Professions, Bhattacharya was, at all relevant times, registered as the sole officer, director, and shareholder of General Medical.

78.     According to Bhattacharya, he purchased the Universal Medical practice from a physician named Manuel Farescal, M.D. ("Farescal"), and following the closing of the sale, Bhattacharya commenced the operation of General Medical at a facility located at 3857 Kings Highway, Brooklyn, NY.

79.     Subsequently, in or around June 2012, General Medical expanded its practice to a second location at 87-36 Lefferts Boulevard, Richmond Hill, NY, and commenced business under the name "All Family Pain Management."

### 3.     Superior Medical Replaces All Family Medical and Becomes a "Separate" Entity

80.     In or around September 2007, Superior Medical commenced operations from a clinic located at 3857 Kings Highway, Brooklyn, NY after Universal Medical shuttered its operations at that location.

81.     Superior Medical then operated from the same address as All Family Medical in Richmond Hill, New York.

82.     Desiring to create the impression that Superior Medical was a separate entity with no affiliation to General Medical or the Management Defendants, Anand began operating Superior Medical from a facility located at 35-50 92nd Street, in Jackson Heights, NY, and continued to treat No-Fault-eligible patients.

4.     **Bhattacharya and Anand's "Nominal" Ownership of the PC Defendants**

83.     At all relevant times, both General Medical and Superior Medical were operated in violation of one or more New York state or local licensing requirements necessary to provide professional health care services.

a.     **Bhattacharya and General Medical**

84.     Bhattacharya was never truly the sole officer, director, and shareholder of General Medical.

85.     As explained above, Bhattacharya began practicing medicine under the name General Medical in 2008 after purchasing the Universal Medical practice from Farescal.

86.     Bhattacharya then operated General Medical under the assumed name "Cornelia Pain Management & Rehab" at 3857 Kings Highway, Brooklyn, NY, the same address at which Universal Medical formerly operated.

87.     When Bhattacharya purchased the Universal Medical practice, the transaction included the contents of the existing office (i.e., computers and treatment tables), along with "goodwill."

88.     Bhattacharya purchased Universal Medical from Farescal for approximately $300,000.00, payable in thirty installments of $10,000.00.

89.     There is no written proof of this transaction between Bhattacharya and Farescal.

90.     Bhattacharya also "purchased" a second location for Cornelia Pain Management & Rehab at 50 Court Street, Brooklyn, NY.

91.     Similar to the Kings Highway purchase, there are no written agreements memorializing Bhattacharya's "purchase" of the 50 Court Street office space.

92.     In addition to Cornelia Pain Management & Rehab, in or around June 2012, General Medical also began to operate under the assumed name "All Family Pain Management" after taking over another PC purportedly owned by Farescal (i.e., All Family Medical).

93.     General Medical conducted business as "All Family Pain Management" at 87-36 Lefferts Boulevard, Richmond Hill, NY, the same address where All Family Medical formerly operated.

94.     After a failed attempt to continue the operation of the Lefferts Boulevard facility under the name of a different PC and physician-owner, Bhattacharya was recruited to become the new physician-owner of a PC that would operate from the Lefferts Boulevard location.

95.     Farescal—who was not practicing medicine at the time but was still associated with the operation and management of the "All Family" facility—recruited Bhattacharya to manage the practice at the Lefferts Boulevard location.

96.     According to Bhattacharya, Farescal instructed him to (a) organize a new PC to operate at the Lefferts Boulevard location, and (b) acquire the contents of the practice for the price of the debt that the practice's prior owner had incurred.

97.     At this time, Bhattacharya installed General Medical as the "new PC" at the Lefferts Boulevard location, and began operating the practice under the assumed name "All Family Pain Management."

98.     No written agreement was executed in connection with Bhattacharya's assumption of the practice that was previously operated at the Lefferts Boulevard location.

99.     Bhattacharya assumed the debt incurred by the previous physician-operator of the Lefferts Boulevard clinic based solely on the representation that the Lefferts Boulevard clinic had a busy practice.

100.    Prior to the transaction, however, Bhattacharya performed no due diligence to determine the profitability of the Lefferts Boulevard clinic.

101.    Bhattacharya's purported purchases of General Medical and General Medical's assumed-name practices (i.e., Cornelia Pain Management & Rehab and All Family Pain Management) were not bona fide business transactions.

102.    There are no written agreements or records memorializing any of these transactions.

103.    Bhattacharya could not produce a lease agreement related to the facility where the Cornelia Pain Management & Rehab clinic operated.

104.    Bhattacharya was not a party to the lease related to the facility where the All Family Pain Management clinic operated.

105.    Bhattacharya could not produce any documents substantiating his claims that he owned the equipment used by General Medical.

106.    Bhattacharya conducted absolutely no due diligence before "purchasing" the practice that came to be All Family Pain Management, even though he knew that the previous practice that operated from the Lefferts Boulevard location had incurred significant debt and other liabilities.

107.    During the relevant period, General Medical and its assumed-name practices unlawfully split professional fees with Amsac and its principals pursuant to an agreement permitting Amsac to retain a certain percentage of the monies it collected on behalf of General Medical.

16

### b.  Anand and Superior Medical

108.  Like Bhattacharya, Anand was never truly the sole officer, director, and shareholder of Superior Medical.

109.  Although Anand has claimed she started Superior Medical "from scratch" and without any assistance, Anand could not describe the amount that she initially invested in the commencement of Superior Medical's operation.

110.  Anand's connections to her co-defendants are clear.

111.  Prior to incorporating Superior Medical, Anand worked for Farescal at Farescal's All Family Medical practice starting in or around 2006.

112.  As stated above, upon information and belief, All Family Medical was actually controlled by one or more non-licensed laypersons, including but not limited to Munawar.

113.  Anand, under the Superior Medical name, also provided health care services at the 3857 Kings Highway location on a "trial basis" starting in or around 2008.

114.  Similar to Bhattacharya and General Medical, Anand and Superior Medical also utilized Amsac for billing and collection services.

115.  During the relevant period Superior Medical paid Amsac and its principals at least $7,500.00 per week for "billing and collection services," regardless of the amount Superior Medical actually collected.

116.  The agreement between Superior Medical and Amsac permitted Amsac and its principals to unlawfully share in the professional fees generated by Superior Medical.

### 5.      Common Links Among the PCs, Their "Owners," and Amsac

117.    General Medical and Superior Medical are connected through similar management companies, shared addresses, virtually identical medical forms, and overlaps in patient testing results.

#### a.      Bhattacharya and Anand's Connections to Amsac, Chaudhry, and Munawar

118.    Both Bhattacharya and Anand have personal connections with the principals of Amsac.

119.    These personal relationships were the driving force behind Bhattacharya and Anand's selection as the respective "owners" of General Medical and Superior Medical.

120.    Chaudhry was Bhattacharya's "personal friend."

121.    Munawar was, and is, a "family friend" to Anand.

122.    Based on these relationships, both Bhattacharya and Anand were induced to engage Amsac and its principals to provide billing and collection services to General Medical and Superior Medical.

#### b.      Impossible Duplication of Electrodiagnostic Testing Results among Different Patients of General Medical and Superior Medical

123.    Both Bhattacharya and Anand—through General Medical and Superior Medical, respectively—purportedly conducted electrodiagnostic testing on their patients to assess muscle and nerve function.

124.    Electrodiagnostic ("EDX") testing involves nerve conduction studies and needle electromyography ("EMG") using an EMG machine.

125.    A nerve conduction study is performed by stimulating the nerve with a small electric shock causing each functioning nerve fiber comprising a particular nerve to transmit an electrical charge in both directions away from the point of stimulation.

126.    Electrodes attached to the skin measure the velocity, amplitude, and shape of the responses.  The results are then compared with normal responses to identify any abnormalities.

127.    Given that each component nerve fiber transmits a small electrical charge, the amplitude and area are proportional to the number of functioning nerve fibers within the nerve.

128.    The amount of electricity measured by the recording electrodes is recorded by a machine, which displays a nerve response waveform identifying latency (time of onset), amplitude (height), area (under the curve), and duration (width).

129.    A nerve conduction study report includes both numeric data for the measurements, and a graphic display of the waveforms for each nerve depicting the amount of electricity measured by the recording electrodes.

130.    Every electrodiagnostic test is a unique recording of the electrical characteristics of each nerve tested at a specific moment in time, and even the same nerve on the same person re-tested within moments of an initial test will produce at least slightly different data and waveforms.

131.    However, a comparison of the nerve conduction study data and corresponding waveform images for different patients of General Medical and Superior Medical reveals impossible and fraudulent duplication of the study data and waveform images.

132.    For example, complete—and impossible—duplication of the nerve conduction study data and waveform images exist relative to the sensory motor nerve testing of two Superior

Medical patients (i.e., J.L. (claim no. 0230692246-04) and J.A.V. (claim no. 0174912881-05)) and one General Medical patient (i.e., L.H. (claim no. 0120397012-03)).

133.    These nerve conduction studies were performed on J.L., J.A.V., and L.H. over the course of several years between November 5, 2008 and February 14, 2012.

134.    The numerical data and waveform images derived from the testing of these patients' sensory nerves were completely identical for eight (8) out of the ten (10) nerves tested.

135.    It is impossible to derive identical waveform images for the testing of a patient's nerve conduction velocity—even a single time—given the unique nature of electrodiagnostic testing.

136.    Impossible testing results were also recorded for Superior Medical patient I.M. (claim no. 0224872630-03) and General Medical (d/b/a Cornelia Pain Management and Rehab) patient R.Z. (claim no. 0142959907-01).

137.    A comparison of the waveform images derived from the study of the sensory nerves of I.M. and R.Z.—which were conducted two years apart at two different facilities by two different physicians—reveals complete duplication of five (5) out of the ten (10) waveform images generated from the study.

138.    However, the numerical data related to these identical waveform images is different.

139.    This is utterly impossible because if two waveform images are identical, then the corresponding numerical data must also be identical because the numerical data is derived directly from the waveforms. The numerical data could only be different if the original report generated by the EMG machine was intentionally altered using a word processor or other means.

140.    Likewise, a comparison of the nerve conduction study data and waveform images for Superior Medical patient R.H. (claim no. 0239262579-02) and General Medical patient S.H. (claim no. 0145901724-02) further exposes additional impossible duplications of the waveform images and the corresponding data.

141.    The nerve conduction studies of R.H. and S.H. were conducted three (3) years apart by different physicians at different facilities.

142.    However, the waveform images derived from the study of the sensory nerves of R.H. and S.H. reveals complete duplication of four (4) out of the ten (10) waveform images generated from the study.

143.    These numerical results are impossible because identical waveform images must have correspondingly similar numerical data.

144.    Consequently, this impossible duplication of nerve conduction study data and waveform images among patients of General Medical and Superior Medical demonstrates the clear link between these entities.

145.    The common denominator between General Medical and Superior Medical is Amsac and its principals.

146.    Both Bhattacharya and Anand have admitted that Amsac handles all of General Medical and Superior Medical's billing and collection activity, including the preparation of treatment records, reports, and invoices for submission to Allstate.

147.    Whereas (a) numerous General Medical and Superior Medical patients' records contain identical—and medically impossible—EDX testing data, and (b) Amsac—a layperson controlled entity—is responsible for all billing and collection activity undertaken on behalf of General Medical and Superior Medical, it is clear that Bhattacharya, Anand, General Medical,

Superior Medical, Amsac, Munawar, Chaudhry, and Chumsky (collectively "defendants") have conspired not only to create and submit fraudulent treatment records and No-Fault claims, but have also conspired to allow Amsac, Munawar, Chaudhry, and Chumsky to exert actual and unlawful control over the operation and management of General Medical and Superior Medical.

148.    The fraudulent conduct relative to the EDX testing purportedly provided to patients of General Medical and Superior Medical was made possible by Amsac and its principals' access to the patient records of both General Medical and Superior Medical.

## V.    ALLEGATIONS OF DEFENDANTS' HEALTH CARE BILLING FRAUD SCHEME APPLICABLE TO ALL COUNTS

149.    New York's No-Fault system is designed to provide patients and health care providers with compensation for the provision of health care services, and is also designed to require prompt payment of patient claims.

150.    As a result, the submission of bills by health care service providers for facially-valid services will often result in prompt payment from a No-Fault insurer.

151.    As explained below, at all relevant times, the defendants have taken advantage of this system by creating and submitting to Allstate false and fraudulent treatment records and invoices demanding payment pursuant to New York's No-Fault laws.

152.    As a part of their scheme, the defendants have engaged in the extensive utilization of electrodiagnostic studies as a means of collecting payments from Allstate.

153.    According to the documents and invoices created and submitted to Allstate, the defendants have routinely represented that the billed-for services were performed in a legitimate and clinically-reasonable manner.

154.    However, as explained below, the defendants have routinely created and submitted to Allstate phony and fictitious testing reports and invoices.

155.    In connection with numerous claims, the defendants have intentionally fabricated patient testing results, and based on those testing results, have submitted substantial billing to Allstate seeking—and in many cases receiving—payment for services that were never actually rendered.

156.    In addition to the falsification of patient testing results, the defendants have engaged in a number of prohibited billing practices, including (a) billing for services that were "unbundled," (b) billing for services that were "upcoded," and (c) billing for services that were never actually rendered.

157.    The defendants' health care billing fraud scheme is unique in that although the scheme involves different professional corporations purportedly owned by different licensed physicians, the falsified patient testing results and other indicia of health care billing fraud are virtually identical between the involved health care providers.

158.    As explained below, not only has the defendants' scheme injured Allstate, but it has also compromised and/or endangered the well-being of the patients that they purported to treat.

159.    If the defendants' falsified testing results were actually relied upon, a variety of improper, unnecessary, and in some cases, potentially dangerous treatments and tests could have been provided (or not provided) based on the results of the defendants' testing.

160.    Additionally, in many cases, the same exact fraudulent testing results were used by the different health care provider defendants.

161.    In some cases, the defendants not only falsified the patient testing results, but also transposed those same bogus testing results onto the testing records of their own patients, or patients of another facility.

162.     Specifically, the defendants' testing of numerous patients of General Medical—who were tested at different times for different injuries—inexplicably produced impossible identical testing results.

163.     Likewise, the defendants' testing of numerous patients of Superior Medical—who were also tested at different times for different injuries—also inexplicably produced impossible identical testing results.

164.     Finally, the defendants' testing of patients of both General Medical and Superior Medical inexplicably produced impossible identical testing results even though the testing involved patients of different facilities that were tested for different injuries by different doctors, often years apart.

## VI.   OVERVIEW OF DEFENDANTS' SCHEME TO PROVIDE FRAUDULENT ELECTRODIAGNOSTIC TESTING

165.     At all relevant times, the defendants purportedly performed, among other things, patient examinations at General Medical and Superior Medical in the New York metropolitan area.

166.     Based upon their initial examinations of each patient, Bhattacharya and Anand uniformly ordered a pre-determined protocol of medical services and diagnostic tests, including EDX tests.

167.     Bhattacharya and Anand knew that the medical findings documented on the forms they personally completed would be subsequently utilized as justification for the provision of unnecessary and unwarranted EDX tests to rule out cervical and/or lumbar radiculopathies and other conditions that the patients purportedly sustained from motor vehicle accidents.

168.     The defendants benefited from their pre-determined and fraudulent findings in numerous ways.

169.    Chiefly, Bhattacharya and Anand's findings were used to falsely support the medical necessity for other medical services and diagnostic tests, including EDX tests.

170.    All of the conduct described in ¶¶ 193-661 was designed to maximize the charges that the defendants submitted to Allstate on a per patient basis.

171.    In the case of virtually every patient, Bhattacharya and Anand's initial examination reports routinely concluded that both General Medical and Superior Medical's patients suffered from soft-tissue injuries, radiculopathies, and/or herniations necessitating a treatment plan that included, in many instances, EDX tests and other health care services.

172.    Upon information and belief, the layperson managers of General Medical and Superior Medical (i.e., Chaudhry, Munawar, Chumsky, and Amsac) conspired with Bhattacharya and Anand to determine the nature of all such health care tests and services delivered to patients of General Medical and Superior Medical, including the charges submitted based on these tests and services.

### A.    EDX TESTS

173.    The tests upon which the defendants' scheme is based are electromyography tests ("EMGs") and nerve conduction velocity studies ("NCVs") (which include "F-Wave" and "H-Reflex" studies).

174.    The tests are forms of EDX tests, and were allegedly performed by (or at the direction of) Bhattacharya and Anand, or their employees, because such tests were purportedly medically necessary to diagnose whether General Medical and Superior Medical's patients had radiculopathies.

175. Bhattacharya and Anand purportedly performed (or used personnel to perform) EDX tests on virtually every patient of General Medical and Superior Medical, and issued fraudulent reports that misrepresented the patients' medical and neurological findings.

176. Bhattacharya and Anand diagnosed many patients with cervical (i.e., upper back) and lumbar (i.e., lower back) muscle sprains, and concluded that each patient required EDX testing to rule out cervical and/or lumbar radiculopathy (i.e., irritation or dysfunction of the nerve roots.).

## 1. Overview of Nerve Conduction Velocity Tests ("NCV")

177. NCV tests are non-invasive studies in which peripheral nerves are stimulated with electrical currents.

178. The velocity, amplitude, and shape of the response are then recorded by electrodes attached to the skin, and are compared with well-defined normal parameters and responses to identify the existence, nature, extent, and specific location of any abnormal sensory or motor nerve fibers.  In short, NCV testing confirms that the peripheral nerves are functioning normally.

179. The graphic representations of the electrical results of these studies are called "waveforms."  These waveforms are displayed by the EMG machine, and are printed by the EMG machine on the report.  Specific numerical data is derived from the waveforms, and such data is printed on the patient's medical report.

180. Electrodiagnostic testing must never follow a predetermined protocol.  The decision of which nerves to test in each limb should be tailored to each patient's unique circumstances, and their unique evolving electrodiagnostic findings.  During the performance of

26

the testing, the dynamic decision of which nerve to test next must depend on the findings from the previously-tested nerves.

181.    In a legitimate clinical setting, the decision of which nerves to test for each patient must be made dynamically, and is based on (a) an evaluation of the patient's history, (b) a detailed neurologic examination of the patient, and (c) the "real time" results obtained during the actual NCV test.

182.    As a result, the selection and number of nerves studied during an NCV test should vary from patient-to-patient.  Furthermore, the findings of an abnormality in a specific nerve should trigger further electrodiagnostic investigation to identify the exact nature of the abnormality and the scope of the problem in terms of the number of nerves involved.

183.    In other words, in a legitimate clinical setting, every patient's abnormal NCV test should involve the testing of some different specific nerves.

### 2.    Overview of EMG Tests

184.    EMG tests measure the electrical activity of muscles, and are often done in connection with NCV tests.

185.    An EMG test involves the insertion of a needle into various muscles in the spinal area ("paraspinal muscles"), and in the arms and/or legs to measure electrical activity in each muscle.

186.    The results of the test are compared with well-defined norms to identify the existence, nature, extent, and location of any abnormalities in the muscles, nerves, or nerve roots (i.e., where the nerve splits-off from the spinal cord and emerges from the bony structure of the spine).

187.    There are many different muscles in the arms and legs that can be tested with EMGs.

188.    The decision governing (a) the number of limbs to study, (b) the specific number of muscles to test in each limb, and (c) the specific selection of muscles should be tailored to each patient's unique circumstances and the prior electrodiagnostic testing findings.

189.    In a legitimate clinical setting, the decision concerning the extent of a particular patient's EMG test is determined based on a history and detailed neurological and physical examination of the individual patient, along with an analysis of the real time results obtained during the EMG test and the NCV test.

190.    As a result, the number of limbs and the specific muscles tested during an EMG test should vary from patient to patient, and the decision concerning the number of limbs and muscles to study in each test must be tailored to each patient's unique circumstances.

191.    Such dynamic decision making is an integral part of the professional services provided by the electrodiagnostician.

192.    Accordingly, what constitutes a reasonable and appropriate EMG test for one patient is not the same as for the next patient.

## VII.    SPECIFIC ALLEGATIONS OF WRONGDOING REGARDING DEFENDANTS' PROVISION OF EDX TESTING

193.    The EDX tests purportedly provided to patients of General Medical and Superior Medical were purportedly performed by Bhattacharya and Anand, respectively, because the tests were allegedly medically necessary to rule out Bhattacharya and Anand's (misrepresented) diagnoses of possible radiculopathy.

A.   **INTENTIONAL MISREPRESENTATION OF TESTING DATA EVIDENCED BY DUPLICATIVE DATA AND GRAPHS**

194.   The EDX testing reports created and submitted to Allstate by defendants on behalf of General Medical and Superior Medical's patients are in a format characteristic of that generated by the Cadwell Sierra II machine.

195.   Typically, a report generated by the Cadwell machine displays the numeric data for each set of measurements and a corresponding graphic display of the waveforms for each nerve.

196.   The machine calculates the nerve conduction velocity from the precisely measured latencies and the distance value entered by the machine operator for each measurement.

197.   The graphic waveform generated by the Cadwell machine represents the unique electrical image of a particular nerve's electrical response at each specific moment during the recording.

198.   Each waveform is unique to that recording of the electrical characteristics of that nerve at that very moment.

199.   Even if the same nerve on the same person was re-tested moments later, the waveform would be at least slightly different.

200.   To achieve identical waveforms for different patients, the electrical current measured at the recording electrodes of each different patient would have to be identical microsecond-to-microsecond for the entire duration of the test.

201.   It is medically improbable for this to happen even a single time.

202.   Unlike a fingerprint or DNA—biological markers that are unique from person-to-person and which remain unchanged for that person's lifetime—the waveform generated during

an EDX test is truly unique to both the patient and the specific moment the test was administered.

203.    Each waveform can be thought of as a snowflake—no two are ever identical.

204.    Despite these medical, clinical, and scientific realities, many of the EDX test reports created and submitted to Allstate by the defendants displayed identical waveforms for different patients of General Medical and Superior Medical.

205.    As stated above, the likelihood that any two patients would ever have identical waveforms is medically impossible.

206.    Beyond that, the likelihood that patients of different medical providers would have identical waveforms—especially where the EDX tests were administered by different physicians, at different facilities, years apart from each other—is equally impossible.

207.    However, medically impossible identical NCV waveforms are evident among (a) different patients of General Medical, (b) different patients of Superior Medical, and (c) different patients of General Medical and Superior Medical.

208.    Having identical test results for different patients of different clinics tested by different physicians during different years demonstrates both the vast scope of the defendants' scheme to defraud, and the interrelated nature of the fraudulent schemes perpetrated through these entities.

209.    The defendants' duplicative test results relative to patients of General Medical and Superior Medical demonstrate a clear and collusive relationship among (a) General Medical and Superior Medical, (b) the purported "owners" of General Medical and Superior Medical (i.e., Bhattacharya and Anand), and (c) the individuals and entities who managed and controlled the

operation and billing/collection activity of General Medical and Superior Medical (i.e., Munawar, Chaudhry, Chumsky, and Amsac).

210.    The chart annexed at Exhibit 1 identifies test reports created and submitted by General Medical and Superior Medical wherein the patient's study resulted in waveform and/or data matches to at least one other patient's study.

211.    Accordingly, such testing services that resulted in any waveform and/or data matches are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), and each charge submitted by the defendants in connection with these services is not compensable under New York's No-Fault laws.

212.    To the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, including but not limited to those patients identified in Exhibit 1, Allstate is entitled to recover payments made to the defendants in connection with these bogus services.

213.    Moreover, to the extent any of the charges submitted in connection with these services remain unpaid, Allstate is under no obligation to make any payments in connection with those services, including but not limited to those services identified in Exhibit 1, because the charges submitted by the defendants in connection with these services are fraudulent and not compensable under New York's No-Fault laws.

### 1.    General Medical

214.    The defendants, through General Medical, created and submitted to Allstate numerous EDX test reports that contained identical results across different patients.

215.    The duplication of EDX tests results on behalf of General Medical's patients occurred in two different ways: (a) complete duplication of EDX testing data and waveforms;

and (b) duplication of waveforms and duplication of testing data with fraudulent alteration of such data.

### a.        Complete Duplication of Testing Results

#### i.        *Example No. 1*

216.    General Medical patient W.R. (claim no. 0155615734-04) purportedly underwent an EDX test on January 29, 2010 at General Medical's Cornelia facility.

217.    W.R.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

218.    General Medical patient J.M. (claim no. 0158822551-05) purportedly underwent an EDX test on April 16, 2010 at General Medical's Cornelia facility.

219.    J.M.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

220.    Even though W.R. and J.M.'s tests were performed nearly three months apart, the resulting waveforms and data tables from the upper and lower limb studies of W.R. and J.M. were identical for the following sensory nerves: (a) left and right median nerve; (b) left and right ulnar nerve; (c) left and right sural nerve; and (d) left and right peroneal nerve.

221.    In addition, five (5) out of the eight (8) F-Wave studies performed upon W.R. and J.M. also resulted in identical waveforms and data tables.

222.    The defendants' test results relative to W.R. and J.M. are impossible.

223.    Every EDX test results in a unique recording of the electrical characteristics of each nerve tested at a specific moment in time.

224.    Even if the same nerve on the same person was retested moments later, there would be at least some minimal—but observable—variation in the resulting waveforms.

225.    For the waveforms and accompanying data of two different EDX tests to be identical, the electrical current measured at the recording electrodes of each different patient would have to be identical to the microsecond for the entire duration of the test.

226.    It is impossible for this to happen even a single time.

227.    Because the defendants' EDX testing services purportedly provided to W.R. and J.M. are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), each charge submitted by the defendants in connection with these services are not compensable under New York's No-Fault laws.

228.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, Allstate is entitled to recover payments made to the defendants in connection with these services.

229.    Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by the defendants in connection with the testing services purportedly provided to W.R. and J.M. are not compensable under New York's No-Fault laws for the reasons set forth above.

### ii.    *Example No. 2*

230.    General Medical patient H.S. (claim no. 0210986881-01) purportedly underwent an EDX test on July 22, 2011 at General Medical's Cornelia facility.

231.    H.S.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

232.    General Medical patient J.D. (claim no. 0238465363-01) purportedly underwent an EDX test on May 7, 2012 at General Medical's Cornelia facility.

233.     J.D.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

234.     General Medical patient D.V. (claim no. 0215546052-02) purportedly underwent an EDX test on November 2, 2011 at General Medical's Cornelia facility.

235.     D.V.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya

236.     Even though H.S. and J.D.'s tests were performed nearly ten months apart, the resulting waveforms and data tables from the upper and lower limb studies of H.S. and J.D. were identical for the following sensory nerves: (a) left and right median nerve; (b) left and right ulnar nerve; (c) left and right radial nerve; (d) left and right sural nerve; and (e) left and right peroneal nerve.

237.     In addition, four (4) out of the eight (8) F-Wave studies, and two (2) out of the two (2) H-Reflex studies performed upon H.S., J.D., and D.V. also resulted in identical waveforms and data tables.

238.     The defendants' test results relative to the sensory nerve studies purportedly performed upon H.S. and J.D. are impossible.

239.     Likewise, the defendants' test results relative to the F-Wave and H-Reflex studies purportedly performed upon H.S., J.D., and D.V. are equally impossible.

240.     Every EDX test results in a unique recording of the electrical characteristics of each nerve tested at a specific moment in time.

241.     Even if the same nerve on the same person was retested moments later, there would be at least some minimal—but observable—variation in the resulting waveforms.

242.    For the waveforms and accompanying data of two different EDX tests to be identical, the electrical current measured at the recording electrodes of each different patient would have to be identical to the microsecond for the entire duration of the test.

243.    It is impossible for this to happen even a single time.

244.    Because the defendants' EDX testing services purportedly provided to H.S., J.D., and D.V. are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), each charge submitted by the defendants in connection with these services are not compensable under New York's No-Fault laws.

245.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, Allstate is entitled to recover payments made to the defendants in connection with these services.

246.    Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with the testing services purportedly provided to H.S., J.D., and D.V. are not compensable under New York's No-Fault laws for the reasons set forth above.

**b.    Duplication of Testing Results with Fraudulent Alteration of Data**

247.    General Medical patient K.L. (claim no. 0170922892-01) purportedly underwent an EDX test on August 25, 2010 at General Medical's Cornelia facility.

248.    K.L.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

249.    K.L.'s EDX test included the study of ten (10) sensory nerves in the upper and lower limbs.

250.    General Medical patient E.M. (claim no. 2314651395-02) purportedly underwent an EDX test on September 24, 2010 at General Medical's Cornelia facility.

251.    E.M.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

252.    Similar to K.L, E.M.'s EDX test included the study of ten (10) sensory nerves in the upper and lower limbs.

253.    Even though K.L. and E.M.'s tests were performed a month apart, the resulting numerical data generated from the upper and lower limb studies of K.L. and E.M. were identical for the following sensory nerves: (a) left radial nerve; (b) left peroneal nerve; (c) right peroneal nerve; and (d) right sural nerve.

254.    Notably, however, all ten (10) waveforms generated from the study of K.L. and E.M.'s upper and lower limb sensory nerves are completely identical.

255.    Moreover, the waveforms from K.L. and E.M.'s F-Wave studies are also completely identical.

256.    The defendants' testing results relative to K.L. and E.M.'s EDX tests are impossible.

257.    First, it is impossible for any two waveform images to be identical.

258.    Despite this impossibility, all ten (10) of K.L.'s sensory nerve waveforms were completely identical to all ten (10) of E.M.'s sensory nerve forms.

259.    Second, the machine utilized by the defendants generates both the waveform and numeric data for each nerve study from the same digital information.

260.    The Cadwell machine used by the defendants in conducting these tests is incapable of making arithmetic errors.

261.    As a result, if two waveforms are identical from one study to another, then the corresponding numeric data must also be identical.

262.    In the case of K.L. and E.M., however, the numerical data related to four (4) sensory nerves is identical, while the numerical data related to the remaining six (6) sensory nerves is different.

263.    This is also impossible because if all ten of the patients' waveforms were identical, then the data corresponding to each of the ten waveforms must also be identical.

264.    Here, the defendants have altered and/or contrived the sensory nerve testing data related to K.L. and E.M.

265.    The defendants' actions in this regard are fraudulent.

266.    Because the defendants' EDX testing services purportedly provided to K.L. and E.M. are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), each charge submitted by the defendants in connection with these services are not compensable under New York's No-Fault laws.

267.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, Allstate is entitled to recover payments made to the defendants in connection with these services.

268.    Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by the defendants in connection with the testing services purportedly provided to K.L. and E.M. are not compensable under New York's No-Fault laws for the reasons set forth above.

### 2. **Superior Medical**

269. The defendants, through Superior Medical, created and submitted to Allstate numerous EDX test reports that contained identical results across different patients.

270. The duplication of EDX tests results on behalf of Superior Medical's patients occurred in two different ways: (a) complete duplication of EDX testing data and waveforms; and (b) duplication of waveforms and duplication of testing data with fraudulent alteration of such data.

### a. **Complete Duplication of Testing Results**

271. Similar to General Medical, numerous patients of Superior Medical had testing results that were identical.

272. As explained above, such duplication is impossible and unequivocally demonstrates the defendants' fraudulent conduct.

### i. *Example No. 1*

273. The following nine (9) Superior Medical patients underwent EDX testing by (or at the direction of) Anand over a seven month period from October 2010 through June 2011: M.M. (claim no. 0174912881-04); J.O. (claim no. 0182446179-04); R.A. (claim no. 0184929669-10); M.A. (claim no. 0184929669-07); A.D. (claim no. 0186263000-04); R.T. (claim no. 0189786246-01); I.R. (claim no. 0185779279-04); B.A. (claim no. 0197242225-04); and B.D. (claim no. 0197242225-01).

274. The results derived from the testing of all nine (9) of these patients' sensory motor nerves were completely identical.

275. As explained throughout this Complaint, such duplication of testing results is impossible and is illustrative of the defendants' fraudulent treatment and testing practices.

276.    Superior Medical patient M.M. (claim no. 0174912881-04) purportedly underwent an EDX test on October 22, 2010 at Superior Medical.

277.    M.M.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

278.    The defendants' testing of M.M. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

279.    Superior Medical patient J.O. (claim no. 0182446179-04) purportedly underwent an EDX test on January 28, 2011 at Superior Medical.

280.    J.O.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

281.    The defendants' testing of J.O. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

282.    Superior Medical patient R.A. (claim no. 0184929669-10) purportedly underwent an EDX test on February 9, 2011 at Superior Medical.

283.    R.A.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

284.    The defendants' testing of R.A. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

285.    Superior Medical patient M.A. (claim no. 0184929669-07) purportedly underwent an EDX test on March 2, 2011 at Superior Medical.

286.    M.A.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

287.    The defendants' testing of M.A. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

288.    Superior Medical patient A.D. (claim no. 0186263000-04) purportedly underwent an EDX test on March 16, 2011 at Superior Medical.

289.    A.D.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

290.    The defendants' testing of A.D. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

291.    Superior Medical patient R.T. (claim no. 0189786246-01) purportedly underwent an EDX test on March 23, 2011 at Superior Medical.

292.    R.T.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

293.    The defendants' testing of R.T. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

294.    Superior Medical patient I.R. (claim no. 0185779279-04) purportedly underwent an EDX test on April 14, 2011 at Superior Medical.

295.    I.R.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

296.    The defendants' testing of I.R. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

297.    Superior Medical patient B.A. (claim no. 0197242225-04) purportedly underwent an EDX test on June 2, 2011 at Superior Medical.

298.    B.A.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

299.    The defendants' testing of B.A. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

300.    Superior Medical patient B.D. (claim no. 0197242225-01) purportedly underwent an EDX test on June 10, 2011 at Superior Medical.

301.    B.D.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

302.    The defendants' testing of B.D. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

303.    Even though all nine (9) of these tests were performed months apart, the resulting waveforms and numerical data from the upper and lower limb studies of M.M., J.O., R.A., M.A., A.D., R.T., I.R., B.A., and B.D. were identical for the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

304.    In addition, the F-Wave studies performed upon M.M., J.O., R.A., M.A., A.D., R.T., I.R., B.A., and B.D. also resulted in identical waveforms and data tables.

305.    The defendants' test results relative to M.M., J.O., R.A., M.A., A.D., R.T., I.R., B.A., and B.D. are impossible.

306.    Every EDX test results in a unique recording of the electrical characteristics of each nerve tested at a specific moment in time.

307.    Even if the same nerve on the same person was retested moments later, there would be at least some minimal—but observable—variation in the resulting waveforms.

308.    For the waveforms and accompanying data of two different EDX tests to be identical, the electrical current measured at the recording electrodes of each different patient would have to be identical to the microsecond for the entire duration of the test.  It is impossible for this to happen even a single time.

309.    Because the defendants' EDX testing services purportedly provided to M.M., J.O., R.A., M.A., A.D., R.T., I.R., B.A., and B.D. are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), each charge submitted by the defendants in connection with these services are not compensable under New York's No-Fault laws.

310.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, Allstate is entitled to recover payments made to the defendants in connection with these services.

311.    Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with the testing

services purportedly provided to M.M., J.O., R.A., M.A., A.D., R.T., I.R., B.A., and B.D. are not compensable under New York's No-Fault laws for the reasons set forth above.

ii.  *Example No. 2*

312.  Superior Medical patient J.V. (claim no. 0174912881-05) purportedly underwent an EDX test on October 22, 2010 at Superior Medical.

313.  J.V.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

314.  The defendants' testing of J.V. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

315.  Superior Medical patient J.L. (claim no. 0230692246-04) purportedly underwent an EDX test on February 14, 2012 at Superior Medical.

316.  J.L.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

317.  The defendants' testing of J.L. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

318.  Even though J.V. and J.L.'s tests were performed approximately sixteen (16) months apart, the resulting waveforms and numerical data from the upper and lower limb studies of J.V. and J.L. were identical for the following sensory nerves: (a) left and right median nerves; (b) left and right peroneal nerves; (c) left and right sural nerves; and (d) left and right ulnar nerves.

319.  The defendants' test results relative to J.V. and J.L. are impossible.

320.    Every EDX test results in a unique recording of the electrical characteristics of each nerve tested at a specific moment in time.

321.    Even if the same nerve on the same person was retested moments later, there would be at least some minimal—but observable—variation in the resulting waveforms.

322.    For the waveforms and accompanying data of two different EDX tests to be identical, the electrical current measured at the recording electrodes of each different patient would have to be identical to the microsecond for the entire duration of the test.

323.    It is impossible for this to happen even a single time.

324.    Because the defendants' EDX testing services purportedly provided to J.V. and J.L. are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), each charge submitted by the defendants in connection with these services are not compensable under New York's No-Fault laws.

325.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, Allstate is entitled to recover payments made to the defendants in connection with these services.

326.    Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with the testing services purportedly provided to J.V. and J.L. are not compensable under New York's No-Fault laws for the reasons set forth above.

3.     **General Medical and Superior Medical**

327.     As demonstrated above, the defendants created and submitted to Allstate EDX testing reports containing identical waveforms and numerical data between different patients of General Medical, and also between different patients of Superior Medical.

328.     However, the defendants' fraudulent conduct relative to the provision of EDX testing was not limited to the testing of each respective clinic's patients.

329.     Indeed, as demonstrated below, the duplication of patient EDX testing results occurred among different patients of the two clinics.

a.     **Complete Duplication of Testing Results**

330.     The following eight (8) patients underwent EDX testing at General Medical or Superior Medical by (or at the direction of) Bhattacharya or Anand over a three year period from November 2008 through February 2012: L.H. (claim no. 0120397012-03); M.J. (claim no. 0117270298-01); M.M. (claim no. 0113605398-01); M.G. (claim no. 0122703705-03); M.K. (claim no. 0143162733-01); D.M. (claim no. 0140803867-01); J.V. (claim no. 0174912881-05); and J.L. (claim no. 0230692246-04).

331.     The results derived from the testing of all eight (8) of these patients' sensory motor nerves were virtually identical.

332.     As explained throughout this Complaint, such duplication of testing results is impossible and is illustrative of the defendants' fraudulent treatment and testing practices.

333.     General Medical patient L.H. (claim no. 0120397012-03) purportedly underwent an EDX test on November 5, 2008 at General Medical.

334.     L.H.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

335.   The defendants' testing of L.H. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

336.   General Medical patient M.J. (claim no. 0117270298-01) purportedly underwent an EDX test on November 28, 2008 at General Medical.

337.   M.J.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

338.   The defendants' testing of M.J. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

339.   General Medical patient M.M. (claim no. 0113605398-01) purportedly underwent an EDX test on December 1, 2008 at General Medical.

340.   M.M.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

341.   The defendants' testing of M.M. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

342.   General Medical patient M.G. (claim no. 0122703705-03) purportedly underwent an EDX test on December 19, 2008 at General Medical.

343.   M.G.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

344.     The defendants' testing of M.G. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

345.     General Medical patient M.K. (claim no. 0143162733-01) purportedly underwent an EDX test on August 17, 2009 at General Medical (d/b/a Cornelia Pain Management & Rehab).

346.     M.K.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

347.     The defendants' testing of M.K. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

348.     General Medical patient D.M. (claim no. 0140803867-01) purportedly underwent an EDX test on November 20, 2009 at General Medical (d/b/a Cornelia Pain Management & Rehab).

349.     D.M.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

350.     The defendants' testing of D.M. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves

351.     Superior Medical patient J.V. (claim no. 0174912881-05) purportedly underwent an EDX test on October 22, 2010 at Superior Medical.

352.     J.V.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

353.   The defendants' testing of J.V. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

354.   Superior Medical patient J.L. (claim no. 0230692246-04) purportedly underwent an EDX test on February 14, 2012 at Superior Medical.

355.   J.L.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

356.   The defendants' testing of J.L. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

357.   Even though the tests on these eight patients were performed approximately three years apart, at two different clinics, by two different physicians, the resulting waveforms and numerical data from the upper and lower limb studies of L.H., M.J., M.M., M.G., M.K., D.M., J.V., and J.L. were identical for the following sensory nerves: (a) left and right median nerves; (b) left and right peroneal nerves; (c) left and right sural nerves; and (d) left and right ulnar nerves.

358.   The defendants' test results relative to L.H., M.J., M.M., M.G., M.K., D.M., J.V., and J.L. are impossible.

359.   Moreover, the defendants' test results relative to L.H., M.J., M.M., M.G., M.K., D.M., J.V., and J.L. demonstrate the existence of a collusive relationship among (a) General Medical and Superior Medical, (b) the purported "owners" of General Medical and Superior Medical (i.e., Bhattacharya and Anand), and (c) the individuals and entities who managed and

controlled the operation and billing/collection activity of General Medical and Superior Medical (i.e., Munawar, Chaudhry, Chumsky, and Amsac).

360.    Every EDX test results in a unique recording of the electrical characteristics of each nerve tested at a specific moment in time.

361.    Even if the same nerve on the same person was retested moments later, there would be at least some minimal—but observable—variation in the resulting waveforms.

362.    For the waveforms and accompanying data of two different EDX tests to be identical, the electrical current measured at the recording electrodes of each different patient would have to be identical to the microsecond for the entire duration of the test.  It is impossible for this to happen even a single time.

363.    Because the defendants' EDX testing services purportedly provided to L.H., M.J., M.M., M.G., M.K., D.M., J.V., and J.L. are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), each charge submitted by the defendants in connection with these services is not compensable under New York's No-Fault laws.

364.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, Allstate is entitled to recover payments made to the defendants in connection with these services.

365.    Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with the testing services purportedly provided to L.H., M.J., M.M., M.G., M.K., D.M., J.V., and J.L. are not compensable under New York's No-Fault laws for the reasons set forth above.

### b. Duplication of Testing Results with Fraudulent Alteration of Data

#### i. *Example No. 1*

366. General Medical patient R.Z. (claim no. 0142959907-01) purportedly underwent an EDX test on September 16, 2009 at General Medical.

367. R.Z.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

368. The defendants' testing of R.Z. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

369. Superior Medical patient I.M. (claim no. 0224872630-03) purportedly underwent an EDX test on January 13, 2012 at Superior Medical.

370. I.M.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

371. The defendants' testing of I.M. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

372. Even though R.Z. and I.M.'s tests were performed well over two (2) years apart, at two different clinics, by two different physicians, the resulting waveforms from the upper and lower limb studies of R.Z. and I.M. were identical for the following sensory nerves: (a) right median nerve; (b) right peroneal nerve; (c) right sural nerve; and (d) left and right ulnar nerves.

373. Notably, however, the numerical data related to these waveforms is not identical.

374. As stated above, this is impossible.

375.    The machine utilized by the defendants generates both the waveform and numeric data for each nerve study from the same digital information.

376.    The Cadwell machine used by the defendants in conducting these tests is incapable of making arithmetic errors.

377.    As a result, if two waveforms are identical from one study to another, then the corresponding numerical data must also be identical.

378.    In the case of R.Z. and I.M., however, the numerical data that corresponds to the identical waveforms is slightly different.

379.    This is also impossible because if the patients' waveforms were identical, then the data corresponding to each of the waveforms must also be identical.

380.    Here, the defendants have altered and/or contrived the sensory nerve testing data related to R.Z. and I.M.

381.    The defendants' actions in this regard are fraudulent.

382.    Moreover, the defendants' test results relative to R.Z. and I.M. demonstrate the existence of a collusive relationship among (a) General Medical and Superior Medical, (b) the purported "owners" of General Medical and Superior Medical (i.e., Bhattacharya and Anand), and (c) the individuals and entities who managed and controlled the operation and billing/collection activity of General Medical and Superior Medical (i.e., Munawar, Chaudhry, Chumsky, and Amsac).

383.    For the waveforms and accompanying data of two different EDX tests to be identical, the electrical current measured at the recording electrodes of each different patient would have to be identical to the microsecond for the entire duration of the test.

384.    It is impossible for this to happen even a single time.

385. Because the defendants' EDX testing services purportedly provided to R.Z. and I.M. are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), each charge submitted by the defendants in connection with these services is not compensable under New York's No-Fault laws.

386. Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, Allstate is entitled to recover payments made to the defendants in connection with these services.

387. Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with the testing services purportedly provided to R.Z. and I.M. are not compensable under New York's No-Fault laws for the reasons set forth above.

### ii.    *Example No. 2*

388. General Medical patient S.H. (claim no. 0145901724-02) purportedly underwent an EDX test on September 23, 2009 at General Medical's Cornelia facility.

389. S.H.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

390. The defendants' testing of S.H. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

391. Superior Medical patient R.H. (claim no. 0239262579-02) purportedly underwent an EDX test on October 16, 2012 at Superior Medical.

392.     R.H.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

393.     The defendants' testing of R.H. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; and (c) left and right ulnar nerves.

394.     Even though S.H. and R.H.'s tests were performed almost three (3) years apart, at two different clinics, by two different physicians, the resulting waveforms from the upper and lower limb studies of S.H. and R.H. were identical for the following sensory nerves: (a) left median nerve; (b) right median nerve; (c) left ulnar nerve; and (d) right ulnar nerve.

395.     Notably, however, the numerical data related to these waveforms is not identical.

396.     As stated above, this is impossible.

397.     The machine utilized by the defendants generates both the waveform and numeric data for each nerve study from the same digital information.

398.     The Cadwell machine used by the defendants in conducting these tests is incapable of making arithmetic errors.

399.     As a result, if two waveforms are identical from one study to another, then the corresponding numerical data must also be identical.

400.     In the case of S.H. and R.H., however, the numerical data that corresponds to the identical waveforms is slightly different.

401.     This is also impossible because if the patients' waveforms were identical, then the data corresponding to each of the ten waveforms must also be identical.

402.     Here, the defendants have altered and/or contrived the sensory nerve testing data related to S.H. and R.H.

53

403.    The defendants' actions in this regard are fraudulent.

404.    Moreover, the defendants' test results relative to S.H. and R.H. demonstrate the existence of a collusive relationship among (a) General Medical and Superior Medical, (b) the purported "owners" of General Medical and Superior Medical (i.e., Bhattacharya and Anand), and (c) the individuals and entities who managed and controlled the operation and billing/collection activity of General Medical and Superior Medical (i.e., Munawar, Chaudhry, Chumsky, and Amsac).

405.    For the waveforms and accompanying data of two different EDX tests to be identical, the electrical current measured at the recording electrodes of each different patient would have to be identical to the microsecond for the entire duration of the test.

406.    It is impossible for this to happen even a single time.

407.    Because the defendants' EDX testing services purportedly provided to S.H. and R.H. are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), each charge submitted by the defendants in connection with these services are not compensable under New York's No-Fault laws.

408.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, Allstate is entitled to recover payments made to the defendants in connection with these services.

409.    Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with the testing services purportedly provided to S.H. and R.H. are not compensable under New York's No-Fault laws for the reasons set forth above.

### iii.     *Example No. 3*

410.     General Medical patient L.H. (claim no. 0120397012-03) purportedly underwent an EDX test on November 5, 2008 at General Medical.

411.     L.H.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

412.     The defendants' testing of L.H. involved, among other things, the study of the left median sensory nerve.

413.     General Medical patient E.Z. (claim no. 0142959907-02) purportedly underwent an EDX test on September 16, 2009 at General Medical's Cornelia facility.

414.     E.Z.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

415.     The defendants' testing of E.Z. involved, among other things, the study of the left median sensory nerve.

416.     Superior Medical patient J.R. (claim no. 0172140105-03) purportedly underwent an EDX test on August 31, 2010 at Superior Medical.

417.     J.R.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

418.     The defendants' testing of J.R. involved, among other things, the study of the left median sensory nerve.

419.     Superior Medical patient J.V. (claim no. 0174912881-05) purportedly underwent an EDX test on October 22, 2010 at Superior Medical.

420.     J.V.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

421.    The defendants' testing of J.V. involved, among other things, the study of the left median sensory nerve.

422.    Despite the fact that L.H., E.Z., J.R., and J.V.'s tests were performed almost three (3) years apart, at two different clinics, by two different physicians, the resulting waveforms from the study of the patients' left median sensory nerve are identical.

423.    Notably, however, the numerical data related to these waveforms is not identical for all four patients.

424.    Rather, the numerical data for the study of the left median sensory nerve of L.H. (a General Medical patient) and J.V. (a Superior Medical patient) is completely identical, while the numerical data for the study of the left median sensory nerve of E.Z. (a General Medical patient) and J.R. (a Superior Medical patient) is completely identical.  As stated above, this is impossible.

425.    If all four patients' waveforms for the left median sensory nerve studies are identical, then the corresponding numerical data should also be identical.

426.    The machine utilized by the defendants generates both the waveform and numeric data for each nerve study from the same digital information.

427.    The Cadwell machine used by the defendants in conducting these tests is incapable of making arithmetic errors.

428.    As a result, if two waveforms are identical from one study to another, then the corresponding numerical data must also be identical.

429.    Here, the defendants have altered and/or contrived the sensory nerve testing data related to L.H., E.Z., J.R., and J.V.

430.    In addition, the sensory nerve studies of E.Z. (a General Medical patient) and J.R. (a Superior Medical patient) also resulted in identical waveforms relative to the patients' (a) right median sensory nerve, (b) left ulnar sensory nerve, and (c) right ulnar sensory nerve.

431.    However, the corresponding numerical data for these studies is only identical for the left median and left ulnar sensory nerves.

432.    These results are impossible on two levels.

433.    First, as stated above, it is impossible that any two patients would have identical waveforms or numerical data.

434.    Second, if two waveforms are identical from one study to another, then the corresponding numerical data must also be identical.

435.    Here, the defendants have further altered and/or contrived the sensory nerve testing data related to E.Z. and J.R. over and above the alterations described above.

436.    The defendants' actions in this regard are fraudulent.

437.    Moreover, the defendants' test results relative to L.H., E.Z., J.R., and J.V. demonstrate the existence of a collusive relationship among (a) General Medical and Superior Medical, (b) the purported "owners" of General Medical and Superior Medical (i.e., Bhattacharya and Anand), and (c) the individuals and entities who managed and controlled the operation and billing/collection activity of General Medical and Superior Medical (i.e., Munawar, Chaudhry, Chumsky, and Amsac).

438.    For the waveforms and accompanying data of two different EDX tests to be identical, the electrical current measured at the recording electrodes of each different patient would have to be identical to the microsecond for the entire duration of the test.

439.    It is impossible for this to happen even a single time.

440.    Because the defendants' EDX testing services purportedly provided to L.H., E.Z., J.R., and J.V. are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), each charge submitted by the defendants in connection with these services are not compensable under New York's No-Fault laws.

441.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, Allstate is entitled to recover payments made to the defendants in connection with these services.

442.    Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with the testing services purportedly provided to L.H., E.Z., J.R., and J.V. are not compensable under New York's No-Fault laws for the reasons set forth above.

### iv.    Example No. 4

443.    General Medical patient J.N. (claim no. 0115260689-01) purportedly underwent an EDX test on November 12, 2008 at General Medical.

444.    J.N.'s EDX test was performed by (or at the direction of) Bhattacharya, and the resulting test report was signed by Bhattacharya.

445.    The defendants' testing of J.N. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; (c) left and right peroneal nerves; (d) left and right sural nerves; and (e) left and right ulnar nerves.

446.    Superior Medical patient F.T. (claim no. 0134336551-01) purportedly underwent an EDX test on April 29, 2009 at Superior Medical.

447.    F.T.'s EDX test was performed by (or at the direction of) Anand, and the resulting test report was signed by Anand.

448.    The defendants' testing of F.T. involved, among other things, the study of the following sensory nerves: (a) left and right median nerves; (b) left and right radial nerves; and (c) left and right ulnar nerves.

449.    Even though J.N. and F.T.'s tests were performed almost five (5) months apart, at two different clinics, by two different physicians, the resulting waveforms from the upper and lower limb studies of S.H. and R.H. were identical for the following sensory nerves: (a) left ulnar nerve; (b) right ulnar nerve; (c) left sural nerve; and (d) right sural nerve.

450.    Notably, however, the numerical data related to these waveforms is not identical. As stated above, this is impossible.

451.    The machine utilized by the defendants generates both the waveform and numeric data for each nerve study from the same digital information.

452.    The Cadwell machine used by the defendants in conducting these tests is incapable of making arithmetic errors.

453.    As a result, if two waveforms are identical from one study to another, then the corresponding numerical data must also be identical.

454.    In the case of J.N. and F.T., however, the numerical data that corresponds to the identical waveforms is slightly different.

455.    This is also impossible because if the patients' waveforms were identical, then the data corresponding to each of the ten waveforms must also be identical.

456.    Here, the defendants have altered and/or contrived the sensory nerve testing data related to J.N. and F.T.

457.    The defendants' actions in this regard are fraudulent.

458.    Moreover, the defendants' test results relative to J.N. and F.T. demonstrate the existence of a collusive relationship among (a) General Medical and Superior Medical, (b) the purported "owners" of General Medical and Superior Medical (i.e., Bhattacharya and Anand), and (c) the individuals and entities who managed and controlled the operation and billing/collection activity of General Medical and Superior Medical (i.e., Munawar, Chaudhry, Chumsky, and Amsac).

459.    For the waveforms and accompanying data of two different EDX tests to be identical, the electrical current measured at the recording electrodes of each different patient would have to be identical to the microsecond for the entire duration of the test.

460.    It is impossible for this to happen even a single time.

461.    Because the defendants' EDX testing services purportedly provided to J.N. and F.T. are fraudulent (irrespective of Allstate's claims that the procedures were not medically necessary in the first instance), each charge submitted by the defendants in connection with these services is not compensable under New York's No-Fault laws.

462.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these EDX tests, Allstate is entitled to recover payments made to the defendants in connection with these services.

463.    Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with the testing services purportedly provided to J.N. and F.T. are not compensable under New York's No-Fault laws for the reasons set forth above.

## VIII.   SPECIFIC   FACTUAL   ALLEGATIONS   REGARDING   DEFENDANTS' FRAUDULENT PROVISION OF EMG STUDIES

### A.   OVER-DIAGNOSIS OF EMG-CONFIRMED RADICULOPATHY

464.    The defendants routinely over-diagnosed radiculopathy in patients of General Medical and Superior Medical.

465.    In assessing the physical condition of patients, both Bhattacharya and Anand found that the vast majority of General Medical and Superior Medical's patients were purportedly suffering from cervical or lumbosacral radiculopathy.

466.    As explained below, these findings are generally impossible and indicative of the defendants' intent to misrepresent the true condition of their patients as a basis to perform unnecessary and expensive treatment and testing.

467.    All of the patients insured by Allstate and treated by the defendants were purportedly injured as the result of automobile accidents.

468.    As a general matter, automobile accidents rarely cause radiculopathy.

469.    A recently-published scientific study found that (a) the frequency of EMG-confirmed cervical radiculopathy following an automobile accident occurs in about 8% of patients, (b) the frequency of EMG-confirmed lumbar radiculopathy following an automobile accident occurs in about 12% of patients, and (c) the frequency of cervical or lumbar radiculopathy occurs in about 19% of cases.

470.    However, Bhattacharya's frequency of EMG-confirmed radiculopathy in General Medical's patients far exceeds these medically-expected norms.

471.    Likewise, Anand's frequency of EMG-confirmed radiculopathy in Superior Medical's patients also significantly exceeds these medically-expected norms.

472.    Based on these findings concerning the purported existence of radiculopathy, it is clear that the defendants' radiculopathy findings are medically impossible.

473.    The discrepancy between the defendants' findings of patient radiculopathy and the medically-expected findings regarding automobile accident induced radiculopathy can only be explained by a knowing misrepresentation of the defendants' electrodiagnostic findings.

**B.     LEVELS OF RADICULOPATHY DIAGNOSED ARE NOT MEDICALLY PLAUSIBLE**

474.    It is well recognized that the vast majority of radiculopathies occur at a single root level.

475.    The defendants' diagnoses of cervical and lumbar radiculopathy are completely inconsistent with medically-accepted studies regarding the likely location of radiculopathy.

476.    For example, most medically-accepted studies on this subject have determined that the vast majority of patients studied—i.e., between 46-70% of the patients in each respective study—experienced radiculopathy at the C7 level only.

477.    Notably, however, Bhattacharya and Anand's diagnosis of cervical radiculopathy in General Medical and Superior Medical's patients is completely inconsistent with the medically-expected location of radiculopathy in the cervical region.

478.    It is generally accepted that cervical radiculopathy resulting from trauma, such as a motor vehicle accident, almost always occurs at a single level on one side of the body. Notably, however, none of the defendants' patients were found to have cervical radiculopathy at a single spinal level.

479.    In fact, every patient diagnosed with radiculopathy was reported to have cervical radiculopathy in at least two spinal levels, and sometimes in three to four spinal levels.

480.    The nerve root patterns of purported lumbosacral radiculopathy observed in Bhattacharya and Anand's studies of General Medical and Superior Medical's patients were equally improbable.

481.    Like cervical radiculopathy, it is generally accepted that lumbar radiculopathy resulting from trauma, such as a motor vehicle accident, almost always occurs at a single level on one side of the body.

482.    Notably, however, none of the defendants' patients were found to have lumbar radiculopathy at a single spinal level.

483.    When Bhattacharya and Anand's studies found lumbosacral radiculopathy, the radiculopathies were always diagnosed at two or more levels.

484.    Moreover, the most common lumbosacral radiculopathy is at the L5 level, with the second most common occurring at the S1 level.

485.    In radiculopathies produced by herniated discs, the resulting radiculopathies occur at the L5 or S1 nerve root in approximately 76-90% of patient studies.

486.    Notably, however, when Bhattacharya and Anand diagnosed lumbosacral radiculopathy, the radiculopathy was virtually never diagnosed at the L5 or S1 level.

487.    The consistent over-diagnosis of multiple levels of radiculopathy by Bhattacharya and Anand demonstrates a complete disregard for the welfare of General Medical and Superior Medical's patients.

488.    The defendants' improbable diagnoses are the result of (a) the knowing misrepresentation of the patients' true condition, (b) the performance of studies on the wrong muscles, and/or (c) the performance of studies on an insufficient number of limb muscles.

489.    Moreover, the defendants' over-diagnosis of multiple levels of radiculopathy was done with the intent to create the appearance that General Medical and Superior Medical's patients were more injured than they actually were, and also permitted the defendants—albeit facially—to perform a battery of unwarranted and invasive patient treatments.

C.    **MEDICALLY IMPLAUSIBLE READINGS OF RECRUITMENT IN THE PARASPINAL MUSCLES**

490.    To record "recruitment," the patient must contract the muscle being sampled in a progressive manner, from starting with minimal contraction (i.e., minimal firing of the muscle fibers) and concluding with maximal contraction (i.e., maximal firing of the muscle fibers).

491.    In a legitimate EMG study, the patient is asked to very slowly—and somewhat painfully—increase the muscle strength being exerted while the EMG needle remains in the muscle.

492.    This very slow progression in muscle contraction is difficult for the patient to perform, and can usually only be performed well enough to allow a recruitment determination in the patient's limb muscles.

493.    It is even more difficult to read the recruitment in the paraspinal muscles since it is very difficult to progressively increase the contraction of the paraspinal muscles.

494.    Accordingly, in a legitimate clinical setting, the determination of recruitment in the paraspinal muscles is not commonly attempted because such recruitment cannot be reliably determined.

495.    Despite this reality, however, both Bhattacharya and Anand read paraspinal recruitment in virtually every EMG study performed at General Medical and Superior Medical.

496.     Again, the medically impossible results derived from virtually every patient's test demonstrates and exemplifies why the defendants' purported provision of EDX testing is fraudulent and non-compensable under New York's No-Fault law.

D.     **PROTOCOL APPROACH TO EMG STUDIES**

497.     In a legitimate clinical setting, the decision concerning the extent of a particular patient's EMG test is determined based on a history and detailed neurological and physical examination of the individual patient, along with an analysis of the real time results obtained during the EMG test and the NCV test.

498.     As a result, the number of limbs and the specific muscles tested during an EMG test should vary from patient to patient.

499.     As described more fully below, the defendants' provision of EMG tests to patients is neither reasonable, legitimate, nor compensable under New York's No-Fault laws.

500.     The defendants never tailored the performance of the EMG tests to the unique circumstances and findings of any patient.   Even when the testing showed different "abnormalities," the number and selection of muscles followed the standardized protocol pattern.

501.     Virtually every General Medical patient received an EMG test that followed a protocol pattern of muscles tested.

502.     Likewise, virtually every Superior Medical patient received an EMG test that followed a protocol pattern of muscles tested.

503.     Providing EMG tests pursuant to these patterns violates the accepted standards of care for patients undergoing EMG testing.

504.    Similar to NCV tests, the decision relative to the specific nerves to be tested during an EMG test must also be made dynamically based on each patient's specific complaints and electrodiagnostic findings.

505.    In other words, in a legitimate clinical setting, every patient's abnormal EMG test should involve the testing of some different specific nerves.

506.    The provision of EMG tests should never be conducted pursuant to a pre-determined protocol that dictates the number of nerves to be tested.

507.    Even if every General Medical and Superior Medical patient actually required an EMG test (which they did not), it is virtually impossible that every patient would require the same number of tests on the same specific nerves given the unique physical characteristics and conditions of each individual patient, particularly if these patients presented with electrodiagnostic abnormalities as alleged.

508.    The claims listed in Exhibit 2 demonstrate a clear pattern of the defendants' use of a specific protocol for the use of EMG tests.

509.    The defendants' utilization of a protocol approach to EMG testing serves no meaningful medical purpose, and the defendants' testing protocols are designed and implemented solely to maximize profit, rather than to aid in the evaluation and treatment of patients.

510.    Accordingly, the defendants' protocol approach to EMG tests—combined with the gross overuse of these tests—demonstrates and exemplifies why each of the defendants' charges relative to EMG tests are fraudulent and non-compensable under New York's No-Fault law.

## IX.   SPECIFIC   FACTUAL   ALLEGATIONS   REGARDING   DEFENDANTS' FRAUDULENT PROVISION OF NCV TESTS

### A.   PROTOCOL APPROACH TO NCV TESTS

511.   Similar to their provision of EMG tests, the defendants routinely employed a protocol approach to the selection of nerve conduction tests, regardless of the patients' individual symptoms or findings.

512.   As a general matter, the electrodiagnostic examination is an extension of the patient's diagnostic history and physical.

513.   The electrodiagnostic examination is a dynamic examination wherein the nerves and muscles studied will change from case-to-case.

514.   As a dynamic study, the nerves and muscles studied will evolve within a specific case as the study progresses.

515.   According to the American Medical Association ("AMA"), the utilization of dynamic decision-making is a prerequisite for the use of electrodiagnostic Current Procedural Terminology ("CPT") codes.

516.   However, the defendants' provision of nerve conduction studies to patients is neither reasonable, legitimate, nor compensable under New York's No-Fault laws.

517.   As described more fully below, the defendants never tailored the performance of the nerve conduction studies to the unique circumstances of any patient.

518.   Instead, virtually every General Medical patient received a nerve conduction study on the same nerves and nerve fibers.

519.   An example of the defendants' routine provision of nerve conduction studies to patient of General Medical is illustrated in the following chart:

| Pattern | Nerves Tested |
|---------|---------------|
| Upper Extremities | Left Median Motor, Right Median Motor, Left Ulnar Motor, Right Ulnar Motor, Left Median Sensory, Right Median Sensory, Left Ulnar Sensory, Right Ulnar Sensory, Left Radial Sensory, Right Radial Sensory |
| Pattern No. 1 (Lower Extremities) | Left Peroneal Motor, Right Peroneal Motor, Left Tibial Motor, Right Tibial Motor, Left Sural Sensory, Right Sural Sensory, Left Superficial Peroneal Sensory, Right Superficial Peroneal Sensory |
| Pattern No. 2 (Lower Extremities) | Left Peroneal Motor, Right Peroneal Motor, Left Tibial Motor, Right Tibial Motor, Left Sural Sensory, Right Sural Sensory |

520. Likewise, virtually every Superior Medical patient received a nerve conduction study on the same nerves and nerve fibers.

521. An example of the defendants' routine provision of nerve conduction studies to patient of Superior Medical is illustrated in the following chart:

| Pattern | Nerves Tested |
|---------|---------------|
| Upper Extremities | Left Median Motor, Right Median Motor, Left Ulnar Motor, Right Ulnar Motor, Left Median Sensory, Right Median Sensory, Left Ulnar Sensory, Right Ulnar Sensory, Left Radial Sensory, Right Radial Sensory |
| Lower Extremities | Left Peroneal Motor, Right Peroneal Motor, Left Tibial Motor, Right Tibial Motor, Left Sural Sensory, Right Sural Sensory, Left Superficial Peroneal Sensory, Right Superficial Peroneal Sensory |

522. Each test of General Medical and Superior Medical's patients' upper extremity nerves targeted the exact same set of ten nerves.

523. Each test of Superior Medical's patients' lower extremity nerves targeted the exact same set of eight nerves.

524. Moreover, virtually every test of General Medical's patients' lower extremity nerves targeted the exact same set of eight nerves.

525. As stated above, the decision relative to the specific nerves to be tested is to be made dynamically based on the patients' specific complaints.

526.     In other words, in a legitimate clinical setting, every patient's nerve conduction study should involve the testing of different specific nerves.

527.     Even if every patient actually required a nerve conduction study (which they did not), it is virtually impossible that every patient would require the same number of tests on the same specific nerves given the unique physical characteristics and conditions of each patient.

528.     The AMA publication "CPT Assistant" describes the requirement for dynamic decision making to be used in the provision of EDX tests.

529.     Specifically, the AMA states:

> [T]here is no single, universally accepted, specific protocol or set of procedures employed for each diagnostic category. Instead, the EDX provider must continually reassess the findings encountered during the performance of the EDX testing . . .

*CPT Assistant*, Vol. 12, Issue 4, April 2002.

530.     The claims listed in Exhibit 3 demonstrate a clear pattern of the defendants' use of a specific protocol for the use of NCV tests.

531.     The defendants' utilization of a protocol approach to NCV testing serves no meaningful medical purpose, and the defendants' testing protocols are designed and implemented solely to maximize profit, rather than to aid in the evaluation and treatment of patients.

532.     Accordingly, the defendants' protocol approach to NCV tests—combined with (a) the complete duplication of testing results related to certain groups of patients, and (b) the defendants' gross overuse of these tests—demonstrates and exemplifies why each of the defendants' charges relative to NCV tests are fraudulent and non-compensable under New York's No-Fault law.

### B.    OVERUTILIZATION OF F-WAVE STUDIES

533.    F-Wave tests are performed to evaluate nerve conduction in portions of the nerve that are closest to the spine, and provide limited information in the evaluation of radiculopathies.

534.    The graphic representations of these studies are called "waveforms."

535.    To find any information of medical significance, each F-Wave test must consist of, at a bare minimum, ten (10) separate instances of nerve stimulation.

536.    Even where ten (10) stimulations have been done, F-Wave tests reveal little additional information that other types of testing, such as EMG testing, could reveal.

537.    In fact, the AMA's CPT Assistant states that the number of Nerve Conduction Studies needed for diagnosis of radiculopathy in 90% of cases is "3 motor studies (with or without F waves) . . ." *CPT* Assistant, April 2002, Volume 12, Issue 4.

538.    Therefore, even where it is even deemed necessary, a maximum of three (3) F-Wave studies are sufficient to aid in the diagnosis of radiculopathy in the vast majority of cases.

539.    Here, in connection with virtually every patient of General Medical and Superior Medical that underwent a NCS, the defendants conducted a minimum of four (4) F-Wave tests on each patient for each battery of tests conducted, regardless of the patient's complaints.

540.    There is no medically-acceptable reason for performing this amount of testing on one patient, let alone on nearly the defendants' entire patient population.

541.    The defendants' purported provision of F-Wave tests had no clinical value because (a) the testing was performed as part of the defendants' protocol approach to EDX testing, an approach that failed to assess, diagnose, or treat any particular patient's condition, and, (b) in many cases, the defendants failed to accurately document the results of the tests, thus resulting in incorrect findings.

542.     Accordingly, the results of all such F-Wave tests are invalid and not useable for clinical diagnostic purposes, and each charge submitted by the defendants in connection with these services is not compensable under New York's No-Fault laws including but not limited to the claims identified in the chart annexed hereto at Exhibit 4.

543.     To the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with the tests itemized in Exhibit 4, Allstate is entitled to recover payments made to the defendants in connection with these services.

544.     Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because these studies were neither reasonable nor medically necessary, and are thus not compensable under New York's No-Fault laws.

### C.     EXCESSIVE PERFORMANCE OF H REFLEX TESTS

545.     The submaximal stimulation of some mixed nerves (i.e., those nerves that contain both motor and sensory fibers) causes an "H reflex" to occur.

546.     Although the H reflex can be performed in more than one mixed nerve, the test is most practical clinically at the S1 level when stimulating the tibial nerve.

547.     The H reflex at the S1 level is a useful technique for finding evidence of unilateral radiculopathy at the S1 level.

548.     However, the H reflex is rarely performed in other mixed nerves, except for research purposes.

549.     In fact, it is not medically necessary to perform H reflex testing in every lower limb EDX study.

550.     Despite this reality, both Bhattacharya and Anand used the H reflex as part of their protocol approach to EDX tests in the evaluation of General Medical and Superior Medical patients.

551.     In every case, the defendants made no attempt to determine whether the H reflex testing was actually necessary.

552.     In the case of virtually every General Medical and Superior Medical patient that was purportedly subjected to EDX testing, none of the H reflex tests done in the lower limb studies were medically necessary.

553.     Accordingly, each charge submitted by the defendants in connection with these services is not compensable under New York's No-Fault laws including but not limited to the claims identified in the chart annexed hereto at Exhibit 5.

554.     To the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with the tests itemized in Exhibit 5, Allstate is entitled to recover payments made to the defendants in connection with these services.

555.     Moreover, to the extent any of the charges submitted in connection with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with those transactions because these studies were neither reasonable nor medically necessary, and are thus not compensable under New York's No-Fault laws.

### D.     FAILURE TO DIAGNOSE ABNORMAL FINDINGS

556.     In virtually every nerve conduction study purportedly performed by Bhattacharya and Anand on the patients of General Medical and Superior Medical, numerous abnormal findings were completely ignored by Bhattacharya and Anand.

557.     The abnormal testing findings were ignored and were not used by Bhattacharya and Anand in rendering their patient diagnoses.

558.     For example, in the case of General Medical patient E.Z. (claim no. 0142959907-02), the following abnormal parameters were completely ignored by Bhattacharya:

| Nerve Tested | Measurement | Observed Value | Normal Value | Result Reported by Bhattacharya | Actual Result |
|---|---|---|---|---|---|
| Left Ulnar Sensory | Peak latency | 4.16 | 2.80-4.00 | Normal | Abnormal |
| Left Median Sensory | Velocity | 36.40 | > 50.00 | Normal | Abnormal |
| Right Median Sensory | Velocity | 36.70 | > 50.00 | Normal | Abnormal |
| Left Ulnar Sensory | Velocity | 33.70 | 50.00 | Normal | Abnormal |
| Right Ulnar Sensory | Velocity | 35.60 | 50.00 | Normal | Abnormal |
| Left Median Motor | Distal Amplitude | 3.89 | 5.00 | Normal | Abnormal |
| Left Median Motor | Velocity | 48.10 | 50.00 | Normal | Abnormal |
| Right Median Motor | Velocity | 49.50 | 5.00 | Normal | Abnormal |
| Left Ulnar Motor | Velocity | 50.50 | 53.00 | Normal | Abnormal |
| Right Ulnar Motor | Velocity | 44.10 | 53.00 | Normal | Abnormal |
| Left Peroneal Motor | Distal Amplitude | 2.36 | 2.50 | Normal | Abnormal |
| Left Sural Sensory | Amplitude | 46.38 | 75.00 | Normal | Abnormal |

559.     The abnormal findings observed during the testing of E.Z. are actually indicative of generalized sensorimotor peripheral neuropathy (i.e., widespread abnormalities of motor and sensory nerves).

560.     However, in providing his impressions of E.Z.'s EDX study, Bhattacharya diagnosed the nerve conduction velocity of E.Z.'s upper and lower extremities as normal.

561.     During the relevant period, Bhattacharya made the same findings with respect to the following General Medical patients:

| Patient Name | Claim No. | Extremities Studied | Total Number of Abnormal Findings |
|---|---|---|---|
| L.C. | 0128727831-01 | Upper and Lower | 7 |
| T.D. | 0129237459-02 | Upper and Lower | 9 |
| H.D. | 0163921745-04 | Upper and Lower | 7 |
| T.G. | 0147979124-07 | Upper and Lower | 7 |
| L.H. | 0120397012-03 | Upper and Lower | 10 |
| S.H. | 0145901724-02 | Upper and Lower | 9 |
| N.J.L. | 4145691525-03 | Upper and Lower | 8 |
| K.L. | 0170922892-01 | Upper | 5 |
| J.M. | 0158822551-05 | Upper and Lower | 12 |
| E.M. | 2314651395-02 | Upper | 11 |
| C.M. | 0180283004-01 | Upper and Lower | 11 |
| J.M. | 0155469638-04 | Upper and Lower | 7 |
| Y.R. | 0147979124-01 | Upper and Lower | 11 |
| W.R. | 0156615734-04 | Upper and Lower | 10 |
| R.S. | 2127498843-03 | Upper | 6 |
| F.T. | 0158822551-01 | Upper and Lower | 10 |
| R.Z. | 0142959907-01 | Upper and Lower | 8 |
| A.A. | 4816995675-02 | Upper and Lower | 6 |
| B.B. | 0212195241-01 | Upper | 2 |
| M.B. | 0173773698-05 | Upper | 9 |
| A.C. | 0178451852-05 | Upper | 9 |
| Y.C. | 0178451852-04 | Upper and Lower | 9 |
| M.C. | 0198893471-01 | Upper and Lower | 6 |
| D.D. | 0216987123-03 | Upper | 6 |
| N.F. | 0255177750-05 | Upper | 7 |
| M.G. | 0122703705-03 | Upper and Lower | 9 |
| C.G. | 0177971371-07 | Upper and Lower | 11 |
| N.H. | 0177971371-09 | Upper and Lower | 12 |
| M.J. | 0117270298-01 | Upper and Lower | 8 |
| M.K. | 0143162733-01 | Upper and Lower | 10 |
| D.M. | 0253413660-03 | Upper and Lower | 8 |
| M.M. | 0170103444-03 | Upper and Lower | 8 |
| D.M. | 0140803867-01 | Upper and Lower | 6 |
| J.N. | 0115260689-01 | Upper and Lower | 7 |
| T.N. | 0203988845-05 | Upper | 4 |
| K.N. | 0125048355-01 | Upper and Lower | 9 |
| S.P. | 0218825651-01 | Upper | 3 |
| H.S. | 0203771050-07 | Upper | 1 |
| R.S. | 0173773698-01 | Upper | 5 |
| T.S. | 0158540856-04 | Upper and Lower | 8 |
| C.W. | 0183888858-04 | Upper and Lower | 10 |
| D.W. | 0198093452-01 | Upper and Lower | 8 |
| N.Z. | 0158860643-02 | Upper and Lower | 12 |

562. Likewise, in the case of Superior Medical patient J.V. (claim no. 0174912881-05), the following abnormal findings were completely ignored by Anand:

| Nerve Tested | Measurement | Observed Value | Normal Value | Result Reported by Anand | Actual Result |
|---|---|---|---|---|---|
| Left Median Sensory | Velocity | 36.40 | < 50.00 | Normal | Abnormal |
| Right Median Sensory | Velocity | 36.70 | < 50.00 | Normal | Abnormal |
| Left Ulnar Sensory | Velocity | 40.00 | 50.00 | Normal | Abnormal |
| Right Ulnar Sensory | Velocity | 39.60 | 50.00 | Normal | Abnormal |
| Left Ulnar Motor | Distal latency | 5.06 | 2.40-3.60 | Normal | Abnormal |
| Left Median Motor | Distal amplitude | 2.99 | 5.00 | Normal | Abnormal |
| Right Ulnar Motor | Distal amplitude | 1.25 | 3.00 | Normal | Abnormal |
| Left Median Motor | Velocity | 41.70 | 50.00 | Normal | Abnormal |
| Left Ulnar Motor | Velocity | 51.10 | 53.00 | Normal | Abnormal |
| Right Ulnar Motor | Velocity | 49.00 | 53.00 | Normal | Abnormal |
| Left Sural Sensory | Amplitude | 3.10 | 75.00 | Normal | Abnormal |
| Right Sural Sensory | Amplitude | 24.54 | 75.00 | Normal | Abnormal |
| Left Post-Tibial Motor | Distal amplitude | 2.00 | 3.00 | Normal | Abnormal |
| Right Post-Tibial Motor | Distal amplitude | 1.51 | 3.00 | Normal | Abnormal |

563. Notably, according to the results of the nerve conduction study purportedly provided to J.V. by Anand, there was at least one abnormality in every nerve tested, which is indicative of generalized sensorimotor neuropathy (i.e., widespread abnormalities of motor and sensory nerves).

564. However, in providing her impressions of J.V.'s nerve conduction study, Anand made no mention of these abnormal findings, and no diagnosis of any type of neuropathy was made.

565. During the relevant period, Anand made the same findings with respect to the following Superior Medical patients:

| Patient Name | Claim No. | Extremities Studied | Total Number of Abnormal Findings |
|---|---|---|---|
| R.A. | 0184929669-10 | Upper and Lower | 12 |
| M.C. | 0197404007-01 | Upper and Lower | 13 |
| E.H. | 0156789463-01 | Upper and Lower | 11 |
| G.H. | 0156789463-05 | Upper and Lower | 8 |
| F.M. | 0153894464-06 | Lower | 3 |
| J.O. | 0182446179-04 | Upper and Lower | 9 |
| J.P. | 0159987170-05 | Upper | 8 |
| M.S. | 0158822551-07 | Upper and Lower | 9 |
| J.R. | 0172140105-03 | Upper | 7 |
| R.R. | 0163503618-05 | Lower | 2 |
| R.T. | 0189786246-01 | Upper and Lower | 12 |
| H.T. | 0177064573-02 | Upper and Lower | 10 |
| B.A. | 0197242225-04 | Upper and Lower | 14 |
| M.A. | 0184929669-07 | Upper and Lower | 14 |
| A.D. | 0186263000-04 | Upper and Lower | 10 |
| B.D. | 0197242225-01 | Upper and Lower | 18 |
| C.F. | 0134336551-04 | Upper and Lower | 5 |
| R.G. | 0145249645-01 | Upper and Lower | 13 |
| L.G. | 0158822551-06 | Upper and Lower | 12 |
| J.K. | 0214365470-08 | Lower | 2 |
| J.M. | 0115032690-01 | Upper | 10 |
| M.M. | 0174912881-04 | Upper and Lower | 11 |
| S.M. | 0174912881-03 | Upper and Lower | 8 |
| A.M. | 0221004286-01 | Upper and Lower | 9 |
| C.M. | 0145249645-04 | Upper and Lower | 11 |
| L.O. | 0108141375-01 | Upper | 7 |
| N.O. | 0229366257-02 | Upper and Lower | 14 |
| I.R. | 0185779279-04 | Upper and Lower | 17 |
| R.R. | 0110818977-02 | Upper | 6 |
| E.S. | 0207269985-06 | Upper and Lower | 15 |
| A.S. | 0152900593-02 | Lower | 7 |
| F.T. | 0134336551-01 | Upper and Lower | 5 |
| M.U. | 0144405446-07 | Upper | 8 |
| M.V. | 0110818977-01 | Upper | 7 |
| C.V. | 0207269985-05 | Upper and Lower | 11 |
| C.Y. | 0182238931-01 | Upper | 6 |

566.    Upon information and belief, virtually every NCV test purportedly performed upon General Medical and Superior Medical's patients—including but not limited to the patients indentified in the proceeding charts—generated abnormal findings that were ignored by Bhattacharya and Anand.

567.    The testing results obtained on behalf of each of these patients demonstrate that Bhattacharya and Anand never reviewed the nerve conduction values for the patients of General Medical and Superior Medical, and thus never performed the professional services for which they billed.

568.    As electrodiagnosticians, Bhattacharya and Anand were obligated to carefully observe the testing results, and draw the clinically appropriate conclusions.

569.    Bhattacharya and Anand utterly failed to meet their obligations in this regard.

570.    Upon information and belief, the defendants' sole intent was to generate medical fees through the provision of these EDX tests, and not to diagnose, treat, and heal patient injuries.

571.    In doing so, Bhattacharya and Anand's testing of General Medical and Superior Medical patients resulted in (a) invalid diagnoses, (b) unnecessary treatment and testing, and (c) misrepresentations relative to the billing of nerve conduction studies.

### E.    UTILIZATION OF IDENTICAL DISTANCES TO MEASURE MOTOR NERVE CONDUCTION VELOCITIES

572.    In nearly all the EDX tests performed at General Medical and Superior Medical, Bhattacharya and Anand used identical distances in measuring the nerve conduction velocities of patients.

573.    In a valid EDX test, the distance between two stimulation sites is measured by the electrodiagnostician, and the distance values are entered manually into the testing machine.

574.    It is medically improbable and unreasonable to use identical distances for the bilateral testing of specific motor nerves.

575.    For example, in the EDX test purportedly provided to H.S. (claim no. 0203771050-07), Bhattacharya recorded the following distances in the measurement of the nerve conduction velocity of H.S.'s motor nerves:

| Nerve Tested | Distance (cm) |
|---|---|
| Right Median Motor Nerve | 24.00 |
| Left Median Motor Nerve | 24.00 |
| Right Ulnar Motor Nerve | 26.00 |
| Left Ulnar Motor Nerve | 26.00 |
| Right Peroneal Motor Nerve | 38.00 |
| Left Peroneal Motor Nerve | 38.00 |
| Right Post-Tibial Motor Nerve | 40.00 |
| Left Post-Tibial Motor Nerve | 40.00 |

576.    Moreover, in the EDX test purportedly provided to G.H. (claim no. 0156789463), Anand recorded the following distances in the measurement of the nerve conduction velocity of G.H.'s motor nerves:

| Nerve Tested | Distance (cm) |
|---|---|
| Right Median Motor Nerve | 21.00 |
| Left Median Motor Nerve | 21.00 |
| Right Ulnar Motor Nerve | 23.00 |
| Left Ulnar Motor Nerve | 23.00 |
| Right Peroneal Motor Nerve | 33.00 |
| Left Peroneal Motor Nerve | 33.00 |
| Right Post-Tibial Motor Nerve | 37.00 |
| Left Post-Tibial Motor Nerve | 37.00 |

577.    The defendants engaged in this pattern of conduct (i.e., using identical distances for the bilateral measurement of specific motor nerves) in the testing of nearly every General Medical and Superior Medical patient, including but not limited to those patients listed in the chart annexed at Exhibit 6.

578.    The defendants' use of identical distance values supports the conclusion that one or more of these measurements was not actually performed, and further undermines the validity of the EDX tests provided to patients of General Medical and Superior Medical.

579.    In connection with each of these tests, the defendants billed Allstate under CPT code 95903, representing a charge for the performance of a nerve conduction test with F-wave measurement.

580.    The defendants' failure to make careful measurements for each nerve and enter it into the machine renders the study invalid whereas the failure to take proper measurements is below the standard of care.  It is clinically impossible to derive any medically significant information from these tests.

581.    Even in cases where the defendants' testing documentation reflects the utilization of non-identical measurements, the tests still had no clinical value because the testing was performed as part of the defendants' protocol approach to EDX testing, an approach that failed to assess, diagnose, or treat any particular patient's condition or electrodiagnostic findings.

582.    Because the defendants performed invalid EDX tests on patients of General Medical and Superior Medical, the defendants' charges for such tests are invalid and useless for clinical diagnostic purposes, including but not limited to those tests identified in the chart annexed at Exhibit 6.

583.    Overall, these studies were neither reasonable nor medically necessary, and are thus not compensable under New York's No-Fault laws.

584.    The defendants' protocol approach to NCV tests, and the resulting gross overutilization of these tests, demonstrates and exemplifies why each of the defendants' charges relative to NCV testing are fraudulent and non-compensable under New York's No-Fault laws.

## X.   SPECIFIC FACTUAL ALLEGATIONS AND EVIDENCE OF DEFENDANTS' BILLING FOR SERVICES NOT ACTUALLY RENDERED

585.   The New York Workers' Compensation Board has established a schedule of fees known commonly as the "Workers' Compensation Fee Schedule" ("Fee Schedule").

586.   The Fee Schedule is used by healthcare providers and insurers to determine the level of reimbursement payable on legitimate claims.

587.   The Fee Schedule uses CPT procedure codes, modifiers, and descriptions.

588.   To receive correct payment for their services, medical providers must correctly identify the procedure performed.

589.   Specific procedures performed are identified by the use of CPT codes created and owned by the AMA and found in the CPT codebook, which is updated annually.  The CPT codes reflect current medical practice.

590.   The AMA provides directives on how to correctly apply these CPT codes in both the CPT codebook, and in the monthly publication *CPT Assistant.*

591.   It is the responsibility of the medical provider to select the CPT code that accurately identifies the services performed.

### A.   Specific Allegations Regarding Defendants' Fraudulent Billing for Examinations and Re-evaluations

592.   As stated above, CPT codes are published annually by the AMA to facilitate the efficient processing of medical charges by insurance carriers and other private and governmental health care payors.

593.   Reimbursement is a function of the relative value units ("RVU") assigned to the CPT code.  The RVU depends on (a) the physician work associated with the procedure, (b) the practice expense associated with providing the service, and (c) the malpractice expense.

594.    Reimbursement for medical services is directly proportionate to the level of the CPT code billed (i.e., the higher the level of CPT code billed, the greater the amount of reimbursement).

595.    Billing a service at a higher level CPT code than actually performed, for the purpose of receiving greater reimbursement, is an example of a fraudulent billing practice, and such charges are not compensable.

596.    The invoices submitted to Allstate by the defendants included CPT codes for initial examinations and/or evaluations that were not performed consistent with the AMA's CPT requirements.

597.    By creating medical bills that included CPT codes, then causing such invoices to be submitted to Allstate, the defendants represented to Allstate that the invoiced medical services were performed in conformity with the AMA's CPT code guidelines.

598.    However, many of the bills prepared and submitted by the defendants were submitted under improper and/or intentionally deceptive CPT codes.

599.    In some cases, in reasonable reliance on the documentation submitted by the defendants, Allstate made payments to the defendants for said medical services.

600.    In other cases, the defendants have submitted invoices demanding payment for such services, and such invoices remain unpaid or have been denied by Allstate.

601.    For the reasons explained below, none of these services were compensable under New York's No-Fault laws as represented by the defendants.

### 1.    Initial Examinations

602.    By way of example, the defendants customarily billed Allstate for a patient's initial office visit under CPT code 99204.

603.     The criteria developed by the AMA to properly assign a CPT code to a service rendered under CPT code 99204 include a number of components and factors, with history, examination, and medical decision-making being the three key components.

604.     To warrant a medical bill demanding payment for CPT code 99204, the CPT codebook requires all of the following: (a) a comprehensive history; (b) a comprehensive examination; and (c) medical decision-making of <u>moderate</u> complexity.

605.     If any of the three key components are not met, CPT code 99204 is not supported.

606.     The factors considered to determine the "complexity of medical decision-making" in arriving at a proper CPT code assignment include:

| | Number of Diagnoses or Management Options | Amount and/or Complexity of Data to be Reviewed | Risk of Complication and/or Morbidity or Mortality |
|---|---|---|---|
| **Moderate complexity medical decision making (CPT Code 99204)** | Multiple | Moderate | Moderate |

607.     The chart annexed at Exhibit 7 identifies all of the General Medical and Superior Medical patients that purportedly received initial examinations/office visits that were billed at the CPT code 99204 level.

608.     Based upon the medical documentation submitted by the defendants for each of the patients identified in Exhibit 7, none of the billing containing charges for CPT code 99204 was warranted, whereas the defendants' medical documentation for each of the patients fails to meet the minimum threshold necessary to bill CPT code 99204.

609.    The defendants failed to document the necessary complexity of medical decision making required by CPT code 99204.

610.    Moreover, even if the patients did actually require moderately-complex decision making, by virtue of the defendants' protocol approach to patient care, the defendants' eliminated all need for any meaningful medical decision making.

611.    Accordingly, for these reasons, all of the defendants' charges for such services are not compensable.

612.    During the relevant period, the defendants submitted, and/or caused to be submitted, claims to Allstate based on these records.

613.    Because the nature and extent of the initial examinations/office visits purportedly provided to the patients identified in the chart annexed at Exhibit 7 were misrepresented, the defendants are not entitled to collect payment for such services under New York's No-Fault laws.

614.    To the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these initial examinations/office visits, Allstate is entitled to recover payments made to the defendants in connection with these services.

615.    Moreover, to the extent any of the charges itemized in Exhibit 7 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

### 2. Re-evaluations

616.    The defendants' charges for patient re-evaluations are also not compensable because the defendants failed to document the necessary criteria required to bill re-evaluations under CPT codes 99214.

617.    The chart annexed at Exhibit 8 identifies all of the General Medical and Superior Medical patients that purportedly received re-evaluations that were billed at the CPT code 99214 level.

618.    Most notably, the defendants' patient re-evaluations failed to document the complexity of medical decision making required by CPT code 99214.

619.    Because the nature and extent of the re-evaluations purportedly provided to the patients identified at Exhibit 8 were misrepresented, the defendants are not entitled to collect payment for such services under New York's No-Fault laws.

620.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these patient re-evaluations, Allstate is entitled to recover payments made to the defendants in connection with the re-evaluations.

621.    Moreover, to the extent any of the charges itemized in Exhibit 8 remain unpaid or have been denied, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

**B.    SPECIFIC ALLEGATIONS REGARDING DEFENDANTS' BILLING FOR PARAVERTEBRAL FACET JOINT INJECTIONS**

622.    The defendants purportedly provided a series of paravertebral facet joint injections to patients of General Medical and Superior Medical.

84

623.    These services were typically documented through a report entitled "Nerve Block Injection Report."

624.    In connection with the purported performance of these services, the defendants routinely submitted charges to Allstate under CPT codes 64470 through 64476.

625.    A number of the charges submitted under these codes included a "-50" code modifier that signified that the procedure was performed bilaterally.

626.    The defendants engaged in impermissible billing conduct with respect to these services.

627.    In 2010, the AMA revised the CPT codes and deleted CPT codes 64470 through 64476.

628.    These deleted codes were replaced with CPT codes 64490 through 64495.

629.    According to the AMA's CPT Codebook, the requirements for the use of the new facet injection codes are as follows:

- Imaging guidance [fluoroscopy CT] and any injection of contrast are inclusive components of CPT codes 64490 through 64495.

- Imaging guidance and localization are required for the performance of paravertebral facet joint injections described by 64490 through 64495.

- If imaging is not used, the provider is required to report the service under CPT codes 20552-20553.

- If ultrasound guidance is used, the provider is required to report the service under CPT codes 0213T-0218T

630.    Applying the current coding requirements, the defendants should have billed these facet joint injections under CPT code 64490 and/or 64491, provided that the services were performed with the required fluoroscopic guidance.

631.    However, none of the defendants' procedures were actually performed with the required fluoroscopic guidance.

632.    Thus, the defendants were required to report these services under CPT codes 20552 and/or 20553, which are trigger point injections.

633.    By billing these services under the incorrect CPT codes, the defendants were able to seek greater reimbursement than they were lawfully entitled to collect whereas the Fee Schedule sets the reimbursement for the incorrect codes at a higher level than the reimbursement for the correct codes.

634.    Moreover, because the defendants used the incorrect CPT code to bill for the purportedly provided paravertebral facet joint injections, the defendants are not entitled to collect payment for such services under New York's No-Fault laws.

635.    Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with these paravertebral facet joint injections, including but not limited to those services identified in the chart annexed at Exhibit 9, Allstate is entitled to recover payments made to the defendants in connection with the re-evaluations.

636.    Moreover, to the extent any of the charges relating to these paravertebral facet joint injections remain unpaid, including but not limited to those services identified in the chart annexed at Exhibit 9, Allstate is under no obligation to make any payments in connection with those transactions because the charges submitted by defendants in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

C.   SPECIFIC ALLEGATIONS REGARDING DEFENDANTS' BILLING FOR EMG SERVICES NOT ACTUALLY RENDERED

637.   According to the AMA's CPT codebook, charges for EMG testing services are to be reported under CPT codes 95861 through 95864.

638.   Charges submitted under CPT codes 95861 through 95864 can only be utilized for "complete studies," which are defined as studies testing a minimum of five (5) limb muscles, or four (4) limb muscles (plus paraspinal muscles) per study.

639.   For billing purposes, the testing of paraspinal muscles—no matter how many paraspinal muscles are actually tested—counts only as a single limb muscle.

640.   In the EMG tests purportedly provided to patients of General Medical and Superior Medical, both Bhattacharya and Anand routinely failed to test the minimum of four (4) limb muscles plus paraspinal muscles.

641.   By billing EMG tests as "complete studies" when they were not, the defendants billed Allstate for services that were not actually rendered.

642.   During the relevant period, nearly every patient of General Medical and Superior Medical that was purportedly subjected to EDX testing received an EMG test that failed to include testing of the required number of limb and paraspinal muscles, including, but not necessarily limited to, those patients listed in the chart annexed at Exhibit 10.

643.   Because the nature and extent of the EMG testing purportedly provided to patients of General Medical and Superior Medical—including but not limited to the patients identified in the chart annexed at Exhibit 10—were misrepresented, the defendants are not entitled to collect payment for such services under New York's No-Fault laws.

644.   Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with the EMG testing purportedly provided to

patients of General Medical and Superior Medical, including but not limited to the patients identified in the chart annexed at Exhibit 10, Allstate is entitled to recover payments made to the defendants in connection with these services.

645.     Moreover, to the extent any of the charges associated with these tests remain unpaid, Allstate is under no obligation to make any payments in connection with the EMG testing purportedly provided to patients of General Medical and Superior Medical, including but not limited to the patients identified in the chart annexed at Exhibit 10, because the charges submitted by defendants in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

### D. SPECIFIC ALLEGATIONS REGARDING DEFENDANTS' BILLING FOR F-WAVE STUDIES NOT ACTUALLY RENDERED

646.     F-Wave tests are performed to evaluate nerve conduction in portions of the nerve that are closest to the spine, and provide information in the evaluation of radiculopathies.

647.     To find any information of medical significance, each F-Wave test must consist of, at a bare minimum, ten (10) separate instances of nerve stimulation.  They require subjecting the patient to a rapid series of at least ten (10) strong electrical shocks.

648.     Indeed, according to the AMA's Current Procedural Terminology Manual ("CPT Manual"), a minimum of ten (10) F-Wave stimulations must be recorded per F-Wave test to allow the practitioner to make a medically-sound determination concerning each patient's condition.

649.     Failure to perform the minimum number of stimulations essentially returns no valid data for the medical provider to use for clinical diagnostic purposes.

650.    In connection with the testing of the majority of General Medical and Superior Medical patients, the defendants failed to perform the number of F-Wave stimulations necessary to make a medically-sound determination at the standard of care.

651.    The defendants' failure to perform the necessary number of F-Wave stimulations is illustrated in the chart annexed hereto at Exhibit 11.

652.    As stated above, the AMA defines the meaning of CPT codes.

653.    When a provider bills for F-Wave testing under CPT code 95903, that provider represents that they performed the test as required by the CPT code.

654.    When a provider performs less than ten (10) F-Wave stimulations and then submits an invoice for the test under CPT code 95903, the provider bills for a service that was not actually rendered.

655.    Moreover, when a provider fails to perform the minimum number F-Wave stimulations, the test is rendered clinically worthless.  Furthermore, the results of improperly performed F-Wave tests (i.e., tests with less than 10 stimulations) can be clinically misleading.

656.    In every case where the defendants failed to perform the requisite number of F-Wave stimulations, it is clinically impossible to derive any medically significant information from these tests.

657.    Even in cases where the defendants' testing documentation reflects the performance of the minimum number of stimulations, the tests still had no clinical value because (a) the testing was performed as part of the defendants' protocol approach to EDX testing, an approach that failed to assess, diagnose, or treat any particular patient's condition or electrodiagnostic findings, and (b) in many cases, the defendants failed to accurately mark the onset of the F-Waves, thus resulting in incorrect findings.

658. Nearly every patient of General Medical and Superior Medical that was purportedly subjected to EDX testing underwent an F-Wave study that failed to include a minimum number of ten (10) F-Wave stimulations to warrant a charge under CPT code 95903.

659. Because the nature and extent of the F-Wave studies purportedly performed upon patients of General Medical and Superior Medical—including but not limited to the patients identified in the chart annexed at Exhibit 11—were misrepresented, the defendants are not entitled to collect payment for such services under New York's No-Fault laws.

660. Accordingly, to the extent Allstate paid the defendants in reliance on the documents created and submitted in connection with the F-Wave studies purportedly performed upon patients of General Medical and Superior Medical, including but not limited to the patients identified in the chart annexed at Exhibit 11, Allstate is entitled to recover payments made to the defendants in connection with these services.

661. Moreover, to the extent any of the charges associated with the F-Wave studies purportedly performed upon patients of General Medical and Superior Medical—including but not limited to the patients identified in the chart annexed at Exhibit 11—remain unpaid, Allstate is under no obligation to make any payments in connection with those services because the charges submitted by defendants in connection with these services are not compensable under New York's No-Fault laws for the reasons set forth above.

## XI.   SPECIFIC ALLEGATIONS OF MAIL FRAUD RACKETEERING ACTIVITY

662. The defendants created, prepared, and submitted false medical documentation, and also intentionally violated the laws of the United States by devising and intending to devise schemes to defraud and obtain money and property by means of false and fraudulent pretenses in representations, and by placing or causing to be placed, in a post office and/or authorized

depository for mail matter, things to be sent and delivered by the United States Postal Service, in violation of 18 U.S.C. § 1341 (mail fraud) for the purpose of executing such fraudulent schemes and attempting to do so.

663.    Unless otherwise pled to the contrary, all documents, notes, NF-3 claim forms, reports, health insurance claim forms, medical diagnoses, CPT Code tally sheets, referrals, letters, and requests for payments in connection with the insurance claims referenced throughout this pleading traveled through the U.S. Mail.

664.    Every insurance claim related to this matter involved at least one use of the U.S. Mail, including the mailing of, among other things, the notice of claim, initial policies, insurance payments, claims settlement checks, and the return of the cancelled settlement drafts to the financial institution(s) from which the draft(s) were drawn, as well as return of settlement draft duplicates to the insurance carrier's home office for filing.

665.    The defendants either personally used the U.S. Mail to further their fraudulent scheme by causing medical bills and records from General Medical and Superior Medical to be mailed to Allstate and/or counsel for claimants, or acted with knowledge that the use of the U.S. Mail would follow in the ordinary course of business.

666.    The defendants fraudulently reported that General Medical and Superior Medical were legitimately owned, operated, and controlled in accordance with New York law.

667.    The defendants knew that their offices, a patient, a claimant, an insurance carrier, patient's attorney, other medical provider, or Allstate would use the U.S. Mail in connection with each of the fraudulent claims, including issuing payments based upon defendants' fraudulent documentation.

668.     Allstate estimates that the defendants' scheme to defraud generated hundreds of mailings. Tables highlighting selected examples of mail fraud arising from the defendants' patient/business files are annexed at Exhibit 12 and 13, and are incorporated herein by reference as if set forth in their entirety.

## XII.   ALLSTATE'S JUSTIFIABLE RELIANCE

669.     Through the submission of medical records, including NF-3 forms, Bhattacharya and Anand certified and represented to Allstate that General Medical and Superior Medical were incorporated, owned, and operated in compliance with New York law.

670.     In connection with each claim submitted to Allstate on behalf of General Medical and Superior Medical, Bhattacharya and Anand each attested to the medical necessity of the consultations and tests they allegedly performed, as well as the validity of the charges.

671.     Bhattacharya and Anand are—and were—legally and ethically obligated to act honestly and with integrity, and in accordance with their oath as medical professionals.

672.     At all relevant times, the defendants actively concealed from Allstate facts regarding the management and control of General Medical and Superior Medical to prevent Allstate from discovering that General Medical and Superior Medical were unlawfully incorporated, owned, and controlled by one or more non-physicians, and therefore ineligible to bill for or collect No-Fault benefits.

673.     To induce Allstate to promptly pay General Medical and Superior Medical's patient invoices, the defendants submitted—or caused to be submitted—to Allstate NF-3 forms representing that General Medical and Superior Medical were solely owned and controlled by a licensed medical professional in compliance with New York law.

674.    Further, to induce Allstate to promptly pay the fraudulent charges for the consultations and tests allegedly provided, the defendants—on behalf of General Medical and Superior Medical—hired one or more law firms to pursue collection of the fraudulent charges from Allstate and other insurers.

675.    These law firms routinely file time-consuming, expensive litigation and arbitration matters against Allstate and other insurers if the charges are not promptly paid in full.

676.    Allstate is under statutory and contractual obligations to promptly and fairly process claims within 30 days.

677.    The facially valid documents submitted to Allstate in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to, and did, cause Allstate to justifiably rely on them.

678.    As a result, Allstate has incurred damages of more than $2,120,149.00 based upon the fraudulent charges submitted by (or on behalf of) General Medical and Superior Medical.

679.    Based upon the material misrepresentations and other affirmative acts the defendants used to conceal their fraud from Allstate, Allstate did not discover, and could not have reasonably discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### XIII.   **DAMAGES**

680.    The defendants' pattern of fraudulent conduct injured Allstate in its business and property by reason of the aforesaid violations of state and federal law.

681.    Although it is not necessary for Allstate to calculate damages with specificity at this stage in the litigation (whereas Allstate's damages continue to accrue), Allstate's injury includes, but is not limited to, compensatory damages for:

     a.   Payments made to (or on behalf of) General Medical in connection with first-party ("No-Fault") claims of $900,019.51, the exact amount to be determined at trial.  The table annexed at Exhibit 14 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to General Medical in connection with first-party ("No-Fault") claims determined to be fraudulent as of the filing of this Complaint; and

     b.   Payments made to (or on behalf of) Superior Medical in connection with first-party ("No-Fault") claims of $1,220,130.45, the exact amount to be determined at trial.  The table annexed at Exhibit 15 and incorporated herein as if set forth in its entirety, identifies Allstate's payments to Superior Medical in connection with first-party ("No-Fault") claims determined to be fraudulent as of the filing of this Complaint.

## XIV.   CAUSES OF ACTION

### COUNT I
### VIOLATIONS OF 18 U.S.C. § 1962(c)
### GENERAL MEDICAL, P.C. ENTERPRISE
**(Against Nirmala Bhattacharya, as Personal Representative of the Estate of Sujit Bhattacharya, M.D., deceased, Sima Anand, M.D., Superior Medical Rehab, P.C., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, and Amsac, Inc.)**

682.   Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

683.   In connection with each of the claims identified in plaintiffs' Complaint, Sujit Bhattacharya, M.D., Sima Anand, M.D., Superior Medical Rehab, P.C., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, and Amsac, Inc. ("Count I Defendants"), intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

684.   The Count I Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart, annexed hereto as Exhibit 12.

685.   Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

686.   Policies of insurance were delivered to insureds through the U.S. Mail.

687.   Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

688.   As documented above, the Count I Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at General Medical, P.C. to collect payment from

Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

689.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to General Medical, P.C. for the benefit of the Count I Defendants that would not otherwise have been paid.

690.    The Count I Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling them to continue without being detected.

691.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

692.    By filing numerous fraudulent claims in an ongoing scheme, the Count I Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

693.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to General Medical, P.C., for the benefit of the Count I Defendants.

694.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

695.    General Medical, P.C. constitutes an enterprise engaged in, and the activities of which affect interstate commerce.

696. The Count I Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

697. Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count I Defendants' conduct.

698. The Count I Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

699. By virtue of the Count I Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with the Count I Defendants, together with the costs of suit, including reasonable attorneys' fees.

### COUNT II
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### GENERAL MEDICAL, P.C. ENTERPRISE
**(Against Nirmala Bhattacharya, as Personal Representative of the Estate of Sujit Bhattacharya, M.D., deceased, Sima Anand, M.D., Superior Medical Rehab, P.C., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, and Amsac, Inc.)**

700. Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

701. Defendants Sujit Bhattacharya, M.D., Sima Anand, M.D., Superior Medical Rehab, P.C., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, and Amsac, Inc. ("Count II Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of General Medical, P.C.

702. The Count II Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of General Medical, P.C.by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit 12,

and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

703.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of General Medical, P.C., even though General Medical, P.C., as a result of the defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

704.    The Count II Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

705.    The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of General Medical, P.C.in connection with diagnostic testing that was never actually rendered, or whose results were intentionally manipulated and/or fabricated by the Count II Defendants.

706.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

707.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count II Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

## COUNT III
### VIOLATIONS OF 18 U.S.C. §1962(c)
### SUPERIOR MEDICAL REHAB, P.C. ENTERPRISE
**(Against Sima Anand, M.D., Nirmala Bhattacharya, as Personal Representative of the Estate of Sujit Bhattacharya, M.D., deceased, General Medical, P.C., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, and Amsac, Inc.)**

708.    Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

709.    In connection with each of the claims identified in plaintiffs' Complaint, Sima Anand, M.D., Sujit Bhattacharya, M.D., General Medical, P.C., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, and Amsac, Inc. ("Count III Defendants"), intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

710.    The Count III Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the chart, annexed hereto as Exhibit 13.

711.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

712.    Policies of insurance were delivered to insureds through the U.S. Mail.

713.    Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

714.    As documented above, the Count III Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at Superior Medical Rehab, P.C. to collect payment

from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

715.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to Superior Medical Rehab, P.C. for the benefit of the Count III Defendants that would not otherwise have been paid.

716.    The Count III Defendants' pattern of submitting fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the defendants' scheme to continue without being detected.

717.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

718.    By filing numerous fraudulent claims in an ongoing scheme, the Count III Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

719.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to Superior Medical Rehab, P.C., for the benefit of the Count III Defendants.

720.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

721.    Superior Medical Rehab, P.C. constitutes an enterprise engaged in, and the activities of which affect interstate commerce.

722.    The Count III Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

723.    Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count III Defendants' conduct.

724.    The Count III Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

725.    By virtue of the Count III Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with the Count III Defendants, together with the costs of suit, including reasonable attorneys' fees.

### COUNT IV
### VIOLATIONS OF 18 U.S.C. § 1962(d)
### SUPERIOR MEDICAL REHAB, P.C. ENTERPRISE
**(Against Sima Anand, M.D., Nirmala Bhattacharya, as Personal Representative of the Estate of Sujit Bhattacharya, M.D., deceased, General Medical, P.C., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, and Amsac, Inc.)**

726.    Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

727.    Defendants Sima Anand, M.D., Sujit Bhattacharya, M.D., General Medical, P.C., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, and Amsac, Inc. ("Count IV Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Superior Medical Rehab, P.C.

728.    The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Superior Medical Rehab, P.C. by means of a pattern of racketeering activity, including numerous acts of mail fraud as set forth in Exhibit

13, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

729.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of Superior Medical Rehab, P.C., even though Superior Medical Rehab, P.C., as a result of the defendants' unlawful conduct, was not eligible to collect such No-Fault payments.

730.    The Count IV Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

731.    The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of Superior Medical Rehab, P.C. in connection with diagnostic testing that was never actually rendered, or whose results were intentionally manipulated and/or fabricated by the Count IV Defendants.

732.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

733.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count IV Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>**COUNT V**</u>
**VIOLATIONS OF 18 U.S.C. §1962(c)**
**AMSAC, INC. ENTERPRISE**
**(Against Nirmala Bhattacharya, as Personal Representative of the Estate of Sujit Bhattacharya, M.D., deceased, Sima Anand, M.D., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, General Medical, P.C., and Superior Medical Rehab, P.C.)**

734.    Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

735.    In connection with each of the claims identified in plaintiffs' Complaint, Sujit Bhattacharya, M.D., Sima Anand, M.D., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, General Medical, P.C., and Superior Medical Rehab, P.C. ("Count V Defendants"), intentionally caused to be prepared and mailed false medical documentation in connection with Allstate insurance claims, in furtherance of this scheme to defraud.

736.    The Count V Defendants employed one or more mailings to demand and/or receive payment on certain dates, including, but not limited to, those dates identified in the charts annexed hereto as Exhibits 12 and 13.

737.    Among other things, NF-3 forms, medical billing invoices, medical reports, applications for insurance, and premium checks were routinely delivered to Allstate through the U.S. Mail.

738.    Policies of insurance were delivered to insureds through the U.S. Mail.

739.    Medical reports and invoices were delivered to Allstate through the U.S. Mail. Payments to defendants traveled via the U.S. Mail.

740.    As documented above, the Count V Defendants repeatedly and intentionally submitted NF-3 forms and other medical documentation to Allstate for medical expenses and/or services that were purportedly performed at General Medical, P.C. and Superior Medical Rehab,

P.C. to collect payment from Allstate under the Personal Injury Protection benefits portion of the Allstate policies and applicable New York No-Fault laws.

741.    As a result of, and in reasonable reliance upon these misleading documents and misrepresentations, Allstate, by its agents and employees, issued drafts to General Medical, P.C. and Superior Medical Rehab, P.C. for the benefit of the Count V Defendants that would not otherwise have been paid.

742.    The Count V Defendants' pattern of fraudulent claims, each appearing legitimate on their face, also prevented Allstate from discovering the fraudulent scheme for a long period of time, thus enabling the defendants' scheme to continue without being detected.

743.    The acts set forth above constitute indictable offenses pursuant to 18 U.S.C. § 1341 (mail fraud).

744.    By filing numerous fraudulent claims in an ongoing scheme, the Count V Defendants engaged in a pattern of racketeering activity within the meaning of 18 U.S.C. § 1962(c).

745.    The activities alleged in this case had the direct effect of causing funds to be transferred from Allstate to General Medical, P.C. and Superior Medical Rehab, P.C. for the benefit of the Count V Defendants.

746.    Allstate (and all plaintiffs individually) is in the business of writing insurance and paying claims in the State of New York.  Insurance fraud schemes practiced here and elsewhere have a deleterious impact on Allstate's overall financial well-being and adversely affect insurance rates.

747.    Amsac, Inc. constitutes an enterprise engaged in, and the activities of which affect interstate commerce.

748.     The Count V Defendants associated with the foregoing enterprise, and participated—both directly and indirectly—in the conduct of this enterprise through a pattern of racketeering activities.

749.     Allstate is a "person" as defined by 18 U.S.C. § 1961(3), injured in its business or property by reason of the Count V Defendants' conduct.

750.     The Count V Defendants' conduct in violation of 18 U.S.C. § 1962(c) was the direct and proximate cause of Allstate's injury.

751.     By virtue of the Count V Defendants' violations of 18 U.S.C. § 1962(c), Allstate is entitled to recover from them three times the damages sustained by reason of the claims submitted by them, and others acting in concert with the Count V Defendants, together with the costs of suit, including reasonable attorneys' fees.

## COUNT VI
## VIOLATIONS OF 18 U.S.C. §1962(d)
## AMSAC, INC. ENTERPRISE
**(Against Nirmala Bhattacharya, as Personal Representative of the Estate of Sujit Bhattacharya, M.D., deceased, Sima Anand, M.D., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, General Medical, P.C., and Superior Medical Rehab, P.C.)**

752.     Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

753.     Defendants Sujit Bhattacharya, M.D., Sima Anand, M.D., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, General Medical, P.C., and Superior Medical Rehab, P.C. ("Count VI Defendants") conspired with each other to violate 18 U.S.C. § 1962(c) through the operation of Amsac, Inc.

754.     The Count IV Defendants each agreed to participate in a conspiracy to violate 18 U.S.C. § 1962(c) by agreeing to conduct the affairs of Amsac, Inc. by means of a pattern of

racketeering activity, including numerous acts of mail fraud as set forth in Exhibits 12 and 13, and through the preparation and/or submission of fraudulent insurance claim documents, including NF-3 forms, to Allstate.

755.    The purpose of the conspiracy was to obtain No-Fault payments from Allstate on behalf of General Medical, P.C. and Superior Medical Rehab, P.C., even though General Medical, P.C. and Superior Medical Rehab, P.C., as a result of the defendants' unlawful conduct, were not eligible to collect such No-Fault payments.

756.    The Count VI Defendants were aware of this purpose, and agreed to take steps to meet the conspiracy's objectives, including the creation of insurance claim documents containing material misrepresentations and/or material omissions.

757.    The purpose of the conspiracy was also to seek No-Fault reimbursement from Allstate on behalf of General Medical, P.C. and Superior Medical Rehab, P.C. in connection with diagnostic testing that was never actually rendered, or whose results were intentionally manipulated and/or fabricated by the Count VI Defendants.

758.    Allstate has been injured in its business and property by reason of this conspiratorial conduct whereas Allstate has been induced to make No-Fault claim payments as a result of the defendants' unlawful conduct described herein.

759.    By virtue of this violation of 18 U.S.C. § 1962(d), the Count VI Defendants are jointly and severally liable to Allstate, and Allstate is entitled to recover from each of the defendants identified three times the damages sustained by reason of the claims submitted by the defendants, and others acting in concert with them, together with the costs of suit, including reasonable attorney's fees.

<u>COUNT VII</u>
**COMMON-LAW FRAUD**
**(Against Nirmala Bhattacharya, as Personal Representative of the Estate of Sujit Bhattacharya, M.D., deceased, Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, General Medical, P.C., and Amsac, Inc.)**

760.    Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

761.    The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that General Medical, P.C. was entitled to receive No-Fault reimbursement under New York law.

762.    The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' NF-3 forms, medical reports, invoices, and collection documentation.

763.    The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

764.    The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from General Medical, P.C.—a fraudulently incorporated and operated medical professional corporation—for payment of No-Fault insurance benefits.

765.    The defendants' misrepresentations were known to be false and were made for the purposes of inducing Allstate to make payments for claims that were not legitimate.

766.    Allstate reasonably relied, to its detriment, upon the defendants' material misrepresentations concerning General Medical, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for medical expenses pursuant to No-Fault insurance claims.

767.    Allstate's damages include, but are not limited to, No-Fault monies paid to General Medical, P.C. for medical expenses and services rendered to Allstate claimants, even though General Medical, P.C. was ineligible to receive No-Fault reimbursement under New York law.  *See* Exhibit 14.

## COUNT VIII
## COMMON-LAW FRAUD
### (Against Sima Anand, M.D., Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, Superior Medical Rehab, P.C., and Amsac, Inc.)

768.    Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

769.    The defendants' scheme to defraud Allstate was dependent upon a succession of material misrepresentations of fact that Superior Medical Rehab, P.C. was entitled to receive No-Fault reimbursement under New York law.

770.    The misrepresentations of fact by the defendants included, but were not limited to, the material misrepresentations of fact made in defendants' NF-3 forms, medical reports, invoices, and collection documentation.

771.    The defendants' representations were false, or required disclosure of additional facts to render the information furnished not misleading.

772.    The misrepresentations were intentionally made by the defendants in furtherance of their scheme to defraud Allstate by submitting claims from Superior Medical Rehab, P.C.—a fraudulently incorporated and operated medical professional corporation—for payment of No-Fault insurance benefits.

773.    The defendants' misrepresentations were known to be false and were made for the purposes of inducing Allstate to make payments for claims that were not legitimate.

774.     Allstate reasonably relied, to its detriment, upon the defendants' material misrepresentations concerning Superior Medical Rehab, P.C.'s eligibility to receive No-Fault reimbursement in paying numerous bills for medical expenses pursuant to No-Fault insurance claims.

775.     Allstate's damages include, but are not limited to, No-Fault monies paid to Superior Medical Rehab, P.C. for medical expenses and services rendered to Allstate claimants, even though Superior Medical Rehab, P.C. was ineligible to receive No-Fault reimbursement under New York law.  *See* Exhibit 15.

**COUNT IX**
**UNJUST ENRICHMENT**
**(Against Nirmala Bhattacharya, as Personal Representative of the Estate of Sujit Bhattacharya, M.D., deceased, Adnan Munawar, Sheryar A. Chaudhry, Leonard A. Chumsky, General Medical, P.C., and Amsac, Inc.)**

776.     Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

777.     When Allstate paid General Medical, P.C., it reasonably believed that Allstate was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations and omissions.

778.     Allstate's payments constitute a benefit which the defendants aggressively sought and voluntarily accepted.

779.     At all relevant times, the defendants caused General Medical, P.C. to wrongfully obtain payments from Allstate (*see* Exhibit 14) through their fraudulent billing scheme as described more fully in the paragraphs above.

780.     Retention of those benefits would violate fundamental principles of justice, equity and good conscience.

**COUNT X**
**UNJUST ENRICHMENT**
**(Against Sima Anand, M.D., Adnan Munawar, Sheryar A. Chaudhry, Leonard A.**
**Chumsky, Superior Medical Rehab, P.C., and Amsac, Inc.)**

781.    Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

782.    When Allstate paid Superior Medical Rehab, P.C., it reasonably believed that Allstate was legally obligated to make such payments based upon the defendants' fraudulent misrepresentations and omissions.

783.    Allstate's payments constitute a benefit which the defendants aggressively sought and voluntarily accepted.

784.    At all relevant times, the defendants caused Superior Medical Rehab, P.C. to wrongfully obtain payments from Allstate (*see* Exhibit 15) through their fraudulent billing scheme as described more fully in the paragraphs above.

785.    Retention of those benefits would violate fundamental principles of justice, equity and good conscience.

**COUNT XI**
**DECLARATORY RELIEF UNDER 28 U.S.C. § 2201**
**(Against General Medical, P.C.)**

786.    Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

787.    To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide health care services in New York.

788.    In view of its (a) illegal corporate structure, (b) unlawful control by non-physicians (i.e., Munawar, Chaudhry, Chumsky, and Amsac, Inc.), (c) unlawful sharing of

110

professional medical fees with non-physicians (i.e., Munawar, Chaudhry, Chumsky, and Amsac, Inc.), (d) billing for health care services that were never actually rendered, and (e) billing for medically unnecessary health care services, General Medical, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional health care services (including but not limited to New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

789.    General Medical, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

790.    General Medical, P.C. continues to challenge Allstate's prior claim denials.

791.    General Medical, P.C. continues to commence litigation and arbitrations against Allstate seeking payment of No-Fault benefits allegedly due and owing.

792.    A justifiable controversy exists between Allstate and General Medical, P.C. because General Medical, P.C. rejects Allstate's ability to deny such claims.

793.    Allstate has no adequate remedy at law.

794.    General Medical, P.C. will also continue to bill Allstate for No-Fault Benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously-denied, and/or any future No-Fault claims submitted by General Medical, P.C.

795.    Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that General Medical, P.C., at all relevant times, was (a) fraudulently incorporated, (b) owned, operated, managed, and/or controlled by one or more non-physicians; (c) engaged in the unlawful sharing of fees derived from the provision of

professional health care services; (d) engaged in the billing for health care services not actually rendered; and (e) engaged the billing for medical unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

### COUNT XII
### DECLARATORY RELIEF UNDER 28 U.S.C. § 2201
### (Against Superior Medical Rehab, P.C.)

796.   Allstate re-alleges, re-pleads and incorporates by reference all allegations set forth in ¶¶ 1-679 above as if fully set forth herein.

797.   To be eligible to receive assigned No-Fault benefits, an assignee provider must adhere to all applicable New York statutes that grant the authority to provide health care services in New York.

798.   In view of its (a) illegal corporate structure, (b) unlawful control by non-physicians (i.e., Munawar, Chaudhry, Chumsky, and Amsac, Inc.), (c) unlawful sharing of professional medical fees with non-physicians (i.e., Munawar, Chaudhry, Chumsky, and Amsac, Inc.), (d) billing for health care services that were never actually rendered, and (e) billing for medically unnecessary health care services, Superior Medical Rehab, P.C. has, at all relevant times, been operating in violation of one or more New York State or local licensing requirements necessary to provide professional health care services (including but not limited to New York Insurance Law, New York Education Law, and New York Business Corporation Law (and other statutory provisions)), and thus has no standing to submit or receive assigned No-Fault benefits.

799.   Superior Medical Rehab, P.C. continues to submit assigned No-Fault claims to Allstate demanding payment, and other assigned No-Fault claims remain pending with Allstate.

800.   Superior Medical Rehab, P.C. continues to challenge Allstate's prior claim denials.

801.     Superior Medical Rehab, P.C. continues to commence litigation and arbitrations against Allstate seeking payment of No-Fault benefits allegedly due and owing.

802.     A justifiable controversy exists between Allstate and Superior Medical Rehab, P.C. because Superior Medical Rehab, P.C. rejects Allstate's ability to deny such claims.

803.     Allstate has no adequate remedy at law.

804.     Superior Medical Rehab, P.C. will also continue to bill Allstate for No-Fault benefit payments absent a declaration by this Court that its activities are unlawful, and that Allstate has no obligation to pay the pending, previously-denied, and/or any future No-Fault claims submitted by Superior Medical Rehab, P.C.

805.     Accordingly, Allstate requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Superior Medical Rehab, P.C., at all relevant times, was (a) fraudulently incorporated, (b) owned, operated, managed, and/or controlled by one or more non-physicians; (c) engaged in the unlawful sharing of fees derived from the provision of professional health care services; (d) engaged in the billing for health care services not actually rendered, and (e) engaged the billing for medical unnecessary treatments and tests, and thus has no standing to submit or receive assigned No-Fault benefits.

## XV.   DEMAND FOR RELIEF

WHEREFORE, plaintiffs, Allstate Insurance Company, Allstate Indemnity Company, Allstate Property & Casualty Insurance Company, Allstate Fire & Casualty Insurance Company, Allstate Vehicle & Property Insurance Company, Allstate New Jersey Insurance Company, and Allstate New Jersey Property & Casualty Insurance Company (collectively, "Allstate"), respectfully pray that judgment enter in their favor, as follows:

## **COUNT I**
### **(Violations of 18 U.S.C. § 1962(c))**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just and appropriate.

## **COUNT II**
### **(Violations of 18 U.S.C. § 1962(d))**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just and appropriate.

## **COUNT III**
### **(Violations of 18 U.S.C. § 1962(c))**

(a)     AWARD Allstate's actual and consequential damages to be established at trial;

(b)     AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)     GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)     GRANT all other relief this Court deems just and appropriate.

### COUNT IV
### (Violations of 18 U.S.C. § 1962(d))

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)   GRANT all other relief this Court deems just and appropriate.

### COUNT V
### (Violations of 18 U.S.C. § 1962(c))

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. §1964, interests, costs and attorneys' fees; and

(c)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)   GRANT all other relief this Court deems just and appropriate.

### COUNT VI
### (Violations of 18 U.S.C. § 1962(d))

(a)   AWARD Allstate's actual and consequential damages to be established at trial;

(b)   AWARD Allstate treble damages pursuant to 18 U.S.C. § 1964, interests, costs and attorneys' fees; and

(c)   GRANT injunctive relief enjoining the defendants from engaging in the wrongful conduct alleged in the Complaint; and

(d)   GRANT all other relief this Court deems just and appropriate.

## COUNT VII
### (Common-law fraud)

(a)     AWARD Allstate its actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct; and

(c)     AWARD Allstate its costs in defending No-Fault collection lawsuits and arbitrations filed by (or on behalf of) the defendants seeking payment of false and fraudulent invoices; and

(d)     GRANT any other relief this Court deems just and appropriate.

## COUNT VIII
### (Common-law fraud)

(a)     AWARD Allstate its actual damages in an amount to be determined at trial;

(b)     AWARD Allstate its costs, including but not limited to, investigative costs incurred in the detection of defendants' illegal conduct; and

(c)     AWARD Allstate its costs in defending No-Fault collection lawsuits and arbitrations filed by (or on behalf of) the defendants seeking payment of false and fraudulent invoices; and

(d)     GRANT any other relief this Court deems just and appropriate.

## COUNT IX
### (Unjust Enrichment)

(a)     AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)     GRANT any other relief this Court deems just and appropriate.

## COUNT X
### (Unjust Enrichment)

(a)     AWARD Allstate's actual and consequential damages to be determined at trial; and

(b)     GRANT any other relief this Court deems just and appropriate.

## COUNT XI
**(Declaratory Relief)**

(a)   DECLARE that General Medical, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York State and/or local licensing requirement necessary to provide professional medical services in New York;

(b)   DECLARE that General Medical, P.C.'s activities are unlawful;

(c)   DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by General Medical, P.C.; and

(d)   GRANT all other relief this Court deems just and appropriate.

## COUNT XII
**(Declaratory Relief)**

(a)   DECLARE that Superior Medical Rehab, P.C., at all relevant times, has been unlawfully organized, controlled, and/or operated by at least one non-physician, and otherwise operated in violation of at least one New York State and/or local licensing requirement necessary to provide professional medical services in New York;

(b)   DECLARE that Superior Medical Rehab, P.C.'s activities are unlawful;

(c)   DECLARE that Allstate has no obligation to pay any pending, previously-denied and/or future No-Fault insurance claims submitted by Superior Medical Rehab, P.C.; and

(d)   GRANT all other relief this Court deems just and appropriate.

## JURY TRIAL DEMAND

The Plaintiffs demand a trial by jury on all claims.


SMITH & BRINK, P.C.

*/s/ Richard D. King, Jr.*
_____
Richard D. King, Jr., (RK8381)
rking@smithbrink.com
Nathan A. Tilden, (NT0571)
ntilden@smithbrink.com
Michael W. Whitcher (MW7455)
mwhitcher@smithbrink.com
Jasmine G. Vieux (JG1805)
jvieux@smithbrink.com
1325 Franklin Ave., Suite 320
Garden City, NY 11530
(347) 710-0050 (phone)

Attorneys for the Plaintiffs,
*Allstate Insurance Company,*
*Allstate Indemnity Company,*
*Allstate Property & Casualty Insurance Company,*
*Allstate Fire & Casualty Insurance Company,*
*Allstate Vehicle & Property Insurance Company,*
*Allstate New Jersey Insurance Company, and*
*Allstate New Jersey Property & Casualty Insurance*
*Company*


Dated:  February 28, 2014